194 N.J. Super. 124 (1984)
476 A.2d 319
IN THE MATTER OF JEFFREY I. KAUFMAN, O.D. AND ROBERT C. MORENSTEIN, O.D.
Superior Court of New Jersey, Appellate Division.
Argued April 16, 1984.
Decided May 31, 1984.
*125 Before Judges BISCHOFF, PETRELLA and BRODY.
Jonathan L. Goldstein argued the cause for appellants Jeffrey I. Kaufman, O.D. and Robert C. Morenstein, O.D. (Hellring, Lindeman, Goldstein & Siegal, attorneys; Stephen L. Dreyfuss on the brief).
Jerald D. Baranoff argued the cause for intervenor, Eyelab, Inc. (Sills, Beck, Cummis, Zuckerman, Radin & Tischman, P.A.; Clive S. Cummis, of counsel).
Douglas J. Harper, Deputy Attorney General, argued the cause for amicus curiae (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Andrea M. Silkowitz, Deputy Attorney General, of counsel).
Louis Pashman, Special Counsel, argued the cause for respondent, New Jersey State Board of Optometrists.
The opinion of the court was delivered by PETRELLA, J.A.D.
The issue on this appeal is whether appellants Drs. Kaufman and Morenstein practice optometry in violation of N.J.S.A. 45:12-11(u). The Board of Optometry (Board), contrary to the advice of the Attorney General,[1] found a violation of the statute and imposed sanctions. The issue herein is related to that raised in another appeal, entitled In re Branch License Applications of Kaufman and Morenstein under docket No. A-318-82, dismissed this date as moot. We conclude that the Board *126 misinterpreted and misapplied the statute, thereby erring in imposing sanctions on appellants. Therefore, we reverse.
Both appellants are optometrists licensed by the State of New Jersey. They also employ several other optometrists. On March 24, 1981 the Board issued "penalty letters" charging Kaufman and Morenstein with violating N.J.S.A. 45:12-11(u) at their Paramus location in Eyelab, Inc.'s (Eyelab) building where appellants practice optometry under the name Eye Exam 21, P.A. (Eye Exam). N.J.S.A. 45:12-11(u) proscribes:
u. Practicing optometry in any retail or commercial store or office not exclusively devoted to the practice of optometry or other health care professions where materials or merchandise are displayed pertaining to a business or commercial undertaking not bearing any relation to the practice of optometry or other health care professions; providing, however, that any optometrist practicing in premises of this type prior to January 1, 1963, shall be permitted to continue in his present location; but when and if any optometrist, who is a lessee or an employee of a lessee, vacates such premises no other optometrist shall be permitted to practice in said vacated premises. Practicing optometry under a false or assumed name, or upon a salary, commission, or any other basis of compensation, while directly or indirectly employed by or associated or connected as an optometrist with any person, association or corporation other than one who possesses a valid unrevoked certificate of registration as an optometrist or a physician licensed in and for the State of New Jersey and who has an actual legal residence within the State.
The Board's letter charged appellants with violating that statute by:
1) practicing optometry in a retail or commercial store or office not exclusively devoted to the practice of optometry or other health care professions where materials or merchandise are displayed pertaining to a business or commercial undertaking not bearing any relation to the practice of optometry or other health care profession; and
2) practicing optometry ... upon a salary, commission or any other basis of compensation, while directly or indirectly employed by or associated or connected as an optometrist with any person, association or corporation other than one who possesses a valid unrevoked certificate of registration as an optometrist....
Appellants were given the option of paying a civil penalty to settle the matter and avoid disciplinary proceedings or requesting a hearing. Kaufman and Morenstein asked for and were given a hearing which took place intermittently from June 17, 1981 to July 28, 1982. Thereafter, appellants consented to four *127 successive orders extending the Board's 45-day time period for decision. See N.J.A.C. 1:1-16.3. The Attorney General withdrew from the case on February 25, 1983 when the settlement discussions failed. The Attorney General's withdrawal was based on the Board's refusal to accept an Attorney General's opinion in the related matter involving the branch license applications previously mentioned. The Attorney General had concluded that the practice of optometry within an ophthalmic dispensing establishment, Eyelab, by itself, was not a violation of the statute. The Attorney General maintained this position in his amicus curiae brief.
The Board's final decision was issued on August 19, 1983 finding that appellants violated the Act. It imposed license suspensions and assessed penalties of $2,000 each against Kaufman and Morenstein, and costs of $9,350 as well as directing that certain corrective action be taken. The suspensions were stayed pending this appeal.
Appellants' landlord in Paramus under a sublease is Eyelab, the principals of which at the time were Messrs. Hillman and Kohan, opticians. Some history of the conflict between optometrists and opticians may be found in New Jersey Optometric Assn. v. Hillman and Kohan, 144 N.J. Super. 411 (Ch.Div. 1976), aff'd 160 N.J. Super. 81 (App.Div. 1978). A source of tension between the two groups is that each is separately permitted to fabricate eyeglasses. This results in the potential for economic competition between the opticians and the optometrists.
The lease between the parties as well as the physical layout of the premises provided the framework for the Board's determination of a violation of section (u). The Eyelab building is a free standing one which houses appellants' practice in one portion and the remaining portion is devoted to the selling of eyeglasses, frames and related items. The Board made specific findings of fact regarding the physical layout of appellants' facility in findings 8, 9 and 10. It concluded that the physical *128 layout of the building makes it difficult to distinguish one operation from the other. The Board found therein that:
* * * * * * * *
8. The dispensing of eyeware in the Eyelab Building is organized into departments within the store. Directories, located as you enter the front of the store, welcome visitors to the store, list the various departments and contain direction to the Eye Exam 21 facility in the west wing;
9. Eye Exam 21 is located to the left as one comes in the front entrance, contiguous to the property occupied by Eyelab and directly opposite the desk used by Eyelab for its cashier. There is also a rear entrance to the building, from which one can enter directly into the Eye Exam 21 portion of the premises by passing through a foyer common to Eye Exam 21 and Eyelab;
10. The selling area of Eyelab is partially separated from the portion leased by Eye Exam on the main floor by a transparent Plexiglas divider with a large open archway between the two containing no door or other device separating the facilities.
* * * * * * * *
Appellants do not challenge the physical description of the building, but rather argue that signs clearly direct the customers to the correct operation, either optometry or opticianry. Intervenor Eyelab asserts that it is essentially part of the marketing concept that the two operations be adjacent and complementary.
The other evidence introduced related to the lease between the parties. The Board argues that although appellants are a subtenant of Eyelab for approximately 1,700 square feet of space on the main floor, appellants also occupy about 1,300 square feet on a lower level used for their contact lens department under the name Contacts 21 and which can be reached by a stairway in the middle of the main floor of the building. There is no written agreement between the parties for those facilities. Appellants testified that rent is paid for that area by inclusion in the total rent paid.
Under the lease appellants pay rental of 10% of the gross receipts, with a minimum required payment of $50,000 per year. During the first six months of operation appellants made no rental payment under the lease. Appellants testified that unpaid rent for this period was prorated into the final lease *129 negotiated. Despite appellants' testimony in that regard, the Board found that no rent was paid from August 1980 to January 1981. Regardless of the manner this is viewed we attach no material significance thereto. We might even take notice that in many rental situations there can be an initial period of lower rent or no rent as an inducement for the tenancy. The Board's major concern was that rent was based upon a percentage of gross profits. Essentially, the Board's argument is that there is something improper about a lease of space by an optometrist based on a percentage of profits. It is conceded that such percentage of profits provisions are generally standard in shopping mall leases. The Board also concluded that because appellants are required to file quarterly reports of gross receipts and permit inspection of their books for verification of the profits that the inference should be drawn that appellants are effectively paid by Eyelab. The facts clearly show that Eyelab receives money from appellants, and not the reverse.
In finding a violation of the statute the Board concluded that because the lease required Eye Exam to be open from 9:30 a.m. to 9:30 p.m., therefore Eye Exam was controlled by Eyelab. This conclusion was reached notwithstanding the testimony of the optometrists that they inserted the provision in the lease in order to exercise control over their employees and eliminate disputes with optometrists who wanted to leave early when business was slow. The Board drew similar conclusions from the provisions in the lease requiring Eye Exam to be open when Eyelab is.
The Board also relied on its finding that approximately $35,000 worth of optometry equipment used by appellants belongs to Eyelab and that there was no separate lease agreement for the equipment.[2] Dr. Morenstein testified that this provision for *130 equipment was not an unusual relationship and was one utilized by Pearle Vision Centers. Although the Board concluded that the fact of ownership of the equipment by Eyelab tended to show an employment relationship, the appellants took the position that the equipment was merely part of the lease arrangement and that the landlord provided that equipment as well as janitorial and utility service. Appellants argued that the total rental figure was calculated with a percentage for the equipment included.
The Board also found that Eyelab employees have free access to the eye examination area and effective access to patients' charts. Appellants do not deny that because of the configuration of the building employees can walk back and forth between the two operations. However, they maintain that there is no unethical solicitation of professional service and that Eyelab employees have no access to confidential patient information. They point out that prescriptions of optometrists must be made available to opticians who require it to execute the prescriptions. Eyelab people can have a prescription checked but are not allowed to read confidential patient charts.
In addition, the Board pointed to the joint advertising of the two corporations as evidence of a violation of section (u). Appellants use an advertising brochure entitled "Eye Lab" which is available in the Eyelab portion of the building. It contains 2 1/2 pages of advertising out of a total of 12 pages which relate to Eye Exam and Contacts 21. Both Eyelab and Eye Exam use the same advertising agency and essentially the same logo. It is also true that the advertisements placed for appellants in newspapers are frequently placed immediately adjacent to Eyelab's advertisement with the common logo over both of the advertisements giving the appearance of one advertisement. The appellants did not dispute these facts except that they produced canceled checks showing payments for their advertising and testified that they paid a percentage of the total costs for the brochure based on the percentage of space utilized by their advertising. There was also an instance in *131 August 1980 where appellants used Eyelab's telephone number in an employment advertisement in the New York Times. Eyelab paid for the advertisement, but appellants testified that sole occurrence was inadvertent and happened prior to the installation of their telephones. Eyelab has since been reimbursed.
Kaufman and Morenstein acknowledge that when they write a prescription, the patient is told that it can be filled at Eyelab. Appellants argue that any optometrist who does not dispense eyeglasses is free to make any suggestion along those lines, and the patients are not bound by their advice. In its finding number 27, the Board concluded that the sublease prohibited Kaufman and Morenstein from dispensing eyeglasses. Unfortunately, none of the parties included a copy of that lease in their papers filed on this appeal. However, we requested and obtained a copy of same at oral argument. Apparently when the lease was submitted to the Board it contained no such prohibition. Our attention has not been directed to any such provision in the lease, and we have been unable to find it. Furthermore, such a conclusion is contrary to the testimony in the record. The testimony was to the effect that any decision not to sell eyeglasses was made solely by the optometrists.
It is clear from the record as a whole that Kaufman and Morenstein are tenants of Eyelab in a building also occupied by Eyelab and used solely for matters related to opticianry. There is an open archway between the two facilities. Kaufman and Morenstein receive all their compensation from their patients and pay a percentage of their profits in accordance with the lease term to Eyelab. The Board concluded that the appellants' business was intended to "appear part of ... Eye Lab" based upon the physical appearance of the building and their advertising practices.
The Board further found that Kaufman and Morenstein had compromised their professional integrity by giving up their right to sell optical supplies and that they were practicing in association with opticians. The Board distinguished between *132 optometry, which it considered a profession under N.J.S.A. 45:12-1 and opticians because of the absence of a similar statutory declaration.[3] It said:
At the outset, it must be noted that N.J.S.A. 45:12-1 specifically declares optometry to be a profession. That is not true of the occupation of an optician. More particularly, if one reviews all of the provisions of N.J.S.A. 45:12-11, a tone is evident: the law is clearly attempting to establish and retain the independence and integrity of the profession and the judgment of those who practice the profession. In the opinion of this Board, there cannot be professionalism and independence in circumstances such as this where the licensed optometrists are so likely to be confused by the public with the opticians and so subject to the control of the opticians. The only way to prevent that is to maintain the separateness of the two enterprises to the greatest possible extent. (Emphasis added.)
Kaufman and Morenstein raised various issues on this appeal in addition to the interpretation and potential violation of the provisions of N.J.S.A. 45:12-11(u). These issues include whether there were violations of the Administrative Procedure Act (N.J.S.A. 52:14B-1 et seq.) and the regulations adopted thereunder (N.J.A.C. 1:1-6.1) and a claim of conflict of interest of the four optometrist members of the Board (see N.J.S.A. 45:12-2 and 45:1-2.2) who engaged in the dispensing of eyeglasses allegedly in competition with appellants and Eyelab, the intervenor in this appeal.
We turn now to the Board's interpretation of N.J.S.A. 45:12-11(u). This regulatory statute being generally penal in nature, we start with the proposition that strict construction is required. In re Portugal, 44 N.J. Super. 7, 13 (App.Div. 1957); Weston v. N.J. State Board of Optometrists, 32 N.J. Super. *133 502, 509 (App.Div. 1954). In order to establish its case the Board must establish all the elements of the offense.
In order to find a violation of N.J.S.A. 45:12-11(u) (previously quoted) the Board must have evidence of each of the following elements:
1. That an optometrist is practicing optometry in a retail or commercial store or office;
2. That the retail or commercial store or office is not exclusively devoted to the practice of optometry or other health care professions; and
3. That materials or merchandise displayed in the retail or commercial store or office pertain to a business or commercial undertaking which does not bear any relation to the practice of optometry or to any other health care profession.
There is no statutory violation if it can be established either that opticians are in a health care profession or that the merchandise displayed by the opticians bears any relationship to the practice of optometry or any other health care profession.
We agree with the position of the appellants and the Attorney General that nothing in the statute prohibits an optometrist from locating adjacent to an optician.[4] It is also clear that an optometrist by statute can dispense eyeglasses from his own office. The Board argues, however, that there must be a physical separation between the two establishments even if they are next door. We do not agree with that argument.[5]
The legislative history of this statute does not support the construction urged by the Board. The language in the present statute was enacted by P.L. 1963 c. 178 effective December 23, 1963. The 1963 amendments deleted the statutory authorization which permitted leasing of space at fixed rentals within stores or businesses of unlicensed persons. The legislative history essentially establishes that the principal purpose of the *134 amendment, insofar as relevant here, was to remove the practicing optometrist from the traditional commercial setting of the retail department store. The statements submitted in connection with the Bill referred to the unprofessional nature of optometry being conducted in department and jewelry stores. There was no reference in the legislative history to locations of an optometrist within an opthalmic dispensing establishment. The Governor's statement on signing the Bill referred to an intent to insulate optometry from the "perils inherent in ... commercialization" and "ordinary commercial endeavors." (Emphasis added.) There is no indication whatsoever that the practice of optometry would be impermissible within any particularized setting encompassing the related field of opticians.
The Attorney General's September 9, 1982 formal opinion issued to the Board in connection with the appellants' branch license applications noted the "close, if not inseparable nexus which exists between opthalmic merchandise and the practice of optometry...."
We conclude that the statute's intent was to prohibit optometrists from practicing out of a store whose essential character was a general department store or a jewelry store. The statutory prohibitions relate to practice from a "business or commercial store ... where materials or merchandise are displayed pertaining to a business ... not bearing any relation to ... optometry or other health care professions." We find the Board's argument that eyeglass displays of opticians are not substantially related to optometry is specious not only in view of the close relationship between optometrists and opticians, but because of their concurrent right to fabricate and sell eyeglasses. N.J.S.A. 45:12-1.
N.J.S.A. 45:12-11(u) does not proscribe the practice of optometry in a retail or commercial store or office unless that store or office displays "materials or merchandise ... pertaining to a business or commercial undertaking not bearing any relation to the practice of optometry or other health care professions." *135 (Emphasis added.) Assuming arguendo that we found opticianry not to be a health care profession in its own right, but rather an artisan craft (we do not hold that an optician is not engaged in a profession), there can be no question but that opticianry bears a close and direct relationship to the practice of optometry. Hence an optometrist is not prohibited from being in either an office or in a specialized retail or commercial store where the sole other business is that of an optician or other health care profession. We find no basis for the Board's determination of a violation of that provision of the statute.
The Board also found that the appellants violated the statute by practicing in association with an unlicensed person. N.J.S.A. 45:12-11(u) prohibits "practicing optometry ... on a salary, commission or any other basis of compensation  while directly or indirectly employed by or associated with any person, association, or corporation other than one who holds a valid unrevoked certificate of registration as an optometrist...."
The Board argues that there is only one operation and that appellants are practicing optometry with opticians. The record does not support the Board's determination that appellants receive compensation from Eyelab. Indeed, the record establishes that appellants pay rent to their landlord, the opticians. We have considered the fact that appellants make use of the equipment, located on the rental premises in the additional space on the bottom floor of the building. That evidence is not sufficient to establish a violation of this penal statute.
Neither the existence of the landlord-tenant relationship here nor the use of the same advertising agency, similar logos or the same hours of operation compel an inference of "oneness." The Board's assertion of a violation of the statutory proscription is not supported by competent proof. We conclude that there is no sustainable basis for the Board's determination, and that it must be set aside as arbitrary, capricious and unreasonable. In re Suspension of Heller, 73 N.J. 292, 309 (1977) and Campbell v. Dept. of Civil Service, 39 N.J. 556, 562 (1963).
*136 In view of our determination we need not address the claims of violation of the Administrative Procedure Act by the Board and the alleged conflict of interest of certain optometrist members of the Board.
The determination of the Board is reversed and the suspensions, penalties and costs are set aside in their entirety.[6]
NOTES
[1] The Attorney General normally represents the Board. Because he took a contrary position to it, special counsel was appointed to prosecute the matter on behalf of the Board, including this appeal.
[2] Paragraph 4 of the lease contemplated a separate equipment lease agreement to be entered into "on or about January 1, 1981."
[3] Webster's 3rd International Dictionary 1811 defines profession as: "(4a) a calling requiring specialized knowledge and often long and intensive preparation including instruction in skills and methods as well as in the scientific, historical or scholarly principles underlying such skills.... b: a principal calling, vocation, or employment. c. the whole body of persons engaged in a calling." We know of no requirement that a prerequisite to being considered a profession is a statutory pronouncement.
[4] The parties concede that an optometrist can even hire an optician.
[5] Appellants had offered to construct a sliding glass door which would open automatically if that would satisfy the Board.
[6] We do, however, note the failure of the Board to appropriately apply its findings of facts to its conclusions of law. Weston v. N.J. State Board of Optometrists, supra, 32 N.J. Super. at 506-507