2001 OK 55

**Curt MASSENGALE, O.D., Appellant,**

v.

**OKLAHOMA BOARD OF EXAMINERS IN OPTOMETRY, Appellee.**

No. 92,854.

Supreme Court of Oklahoma.

July 3, 2001.

Graydon Dean Luthey, Jr., Mark K. Blongewicz, Ronald A. White, Tulsa, Oklahoma, for Appellant.

Daniel J. Gamino, Todd Markum, Oklahoma City, Oklahoma, for Appellee.

KAUGER, J.:

¶1 Certiorari was granted to ad-

dress two issues:[1] 1) whether an agreement to allow LensCrafters to negotiate third-party provider contracts[2] constitutes a prohibited referral agreement under 59 O.S.1991 § 595[3] or OAC 505:10–5–4;[4] and 2) whether the appellant's, Curt Massengale (Massengale/optometrist), relationship with the optical supplier, LensCrafters, has degraded or reduced the quality of visual care in violation of 59 O.S.1991 § 593.[5] We determine that an optometrist's agreement to allow an optical supplier to negotiate a third-party provider agreement, not intended to govern the doctor's professional judgment, and merely providing a list of approved physicians contained within the insurer's network, is not prohibited under 59 O.S.1991 § 595 or OAC 505:10–5–4. The Court of Civil Appeals applied the clear and convincing standard of proof re-

1. We note that the focus of the disciplinary proceeding has narrowed on certiorari. Originally, the Board seemed particularly concerned about the appearance of commercialism arising both from terms of the agreements entered by the optometrist and the optical supplier and the location and appearance of Massengale's office and by provisions of the sublease, operating agreement and service mark agreement which facially might violate statutory provisions and Board rules. [Courts are divided on the issue of whether similar contractual relationships between optometrists and optical suppliers are prohibited. See, upholding similar contractual relationships: *Wyoming State Bd. of Examiners of Optometry v. Pearle Vision Center*, 767 P.2d 969, 82 A.L.R.4th 781 (1989); *Bronstein v. Board of Registration in Optometry*, 403 Mass. 621, 531 N.E.2d 593 (1988); *Dixon v. Zick*, 179 Colo. 278, 500 P.2d 130 (1972); *Bresler v. Tietjen*, 424 S.W.2d 65 (Mo.1968); *State ex rel. Bd. of Optometry v. Sears, Roebuck & Co.*, 102 Ariz. 175, 427 P.2d 126 (1967); *Matter of Kaufman*, 194 N.J.Super. 124, 476 A.2d 319 (1984). But see, striking similar contractual relationships: *Lenscrafters, Inc. v. Sundquist*, 33 S.W.3d 772 (Tenn.2000); *Silverman v. Board of Registration in Optometry*, 344 Mass. 129, 181 N.E.2d 540 (1962); *California Ass'n of Dispensing Opticians*, 143 Cal.App.3d 419, 191 Cal.Rptr. 762 (1983).]. We note that both the operating agreement and the sublease contain severability provisions and that although the service mark license agreement granted Massengale the authority to use the mark, no evidence was presented that the optometrist ever utilized the mark.

2. Third-party provider agreements are agreements between an insurer and a provider of goods or services such as a hospital, doctor, optometrist or dentist. The third-party provider is not a party to the insurance contract but agrees to provide a good or service to a policyholder of the insurance company for a set fee with reimbursement to come from the insurer. See, *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 1082, 59 L.Ed.2d 261 (1979), reh'g denied, 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979); *Dan Purvis Drugs, Inc. v. Aetna Life Ins. Co.*, 412 N.E.2d 129; E. Gillett, "The Business of Insurance Exemption, Exemption, Who Has the Antitrust Exemption," 17 Pac.L.J. 261, 282 (1985).

3. Title 59 O.S.1991 § 595 provides:

"No optometrist, licensed under Chapter 13 of Title 59 of the Oklahoma Statutes, shall enter into any agreement, contract, arrangement, practice, or understanding, written or otherwise, with any optical supplier engaged in the sale of optical goods and materials to the public, whereby persons are referred by the optical supplier to said licensed person, and/or whereby persons are referred back to the optical supplier for the purchase of optical goods and materials."

4. OAC 505:10–5–4 provides:

"Practices may not be established within the premises of any commercial business nor in conjunction with any commercial business, and no optometrist shall use a commercial business as a 'feeder' to his practice of optometry, nor shall any optometrist be employed in practicing optometry by one other than an optometrist registered by the Oklahoma Board of Examiners in Optometry."

The Legislature may delegate rule making authority to agencies, boards and commissions to facilitate the administration of legislative policy pursuant to the Administrative Procedures Act, 75 O.S.1991 § 250 et seq. Title 75 O.S.1991 § 250.2. Administrative rules are valid expressions of lawmaking powers having the force and effect of law. Title 75 O.S. Supp.1997 § 308.2; *Indiana Nat'l Bank v. State ex rel. Dept. of Human Serv.*, 1993 OK 101, ¶ 13, 857 P.2d 53. Administrative rules, like statutes, are given a sensible construction bearing in mind the evils intended to be avoided. *Oklahoma Alcoholic Beverage Control Bd. v. Burris*, 1980 OK 58, ¶ 13, 626 P.2d 1316, 20 A.L.R.4th 593. The Board is authorized to promulgate rules and procedures to carry out its duties. Title 59 O.S.1991 § 583

5. Title 59 O.S.1991 § 593 provides:

"It is the public policy of the State of Oklahoma that optometrists rendering visual care to its citizens shall practice in an ethical, professional manner; that their practices be free from any appearance of commercialism; that the visual welfare of the patient be the prime consideration at all times; and that optometrists shall not be associated with any nonprofessional person or persons in any manner which might degrade or reduce the quality of visual care received by the citizens of this state."

quired by *Johnson v. Board of Governors of Registered Dentists*, 1996 OK 41, ¶ 19, 913 P.2d 1339 in professional licensure causes. Further, a record devoid of any evidence of substandard clinical practices, unsatisfied patients, or testimony indicating that any of the optometrist's employees actually participated in an incentive program sponsored by the optical supplier, will not support professional discipline.

### FACTS

¶ 2 In 1991, the appellee, Oklahoma Board of Examiners in Optometry (Board), sought an opinion from the Attorney General of Oklahoma addressing the issue of whether a licensed optometrist could lease or sublease office space from a retail optical supplier or seller. On December 5, 1991, the Attorney General issued an opinion [6] finding that, under 59 O.S.1981 § 596 [7] and 59 O.S.1981 § 944,[8] a licensed optometrist was prohibited from leasing or subleasing office space from a retail merchandiser, including a retail optical supplier or seller. The Board issued a memorandum to all licensed optometrists on February 27, 1992, advising the practitioners of the opinion and giving all licensees until May 14, 1992, to remove themselves from any situation which could be perceived to violate the Attorney General's findings.[9]

¶ 3 Having given notice of the Attorney General's opinion, the Board voted in May of 1992 to conduct disciplinary hearings against the appellant, Curt Massengale (Massengale/optometrist) and three other optometrists.[10] All of the optometrists subleased offices in shopping malls from LensCrafters or a similar optical supplier. Massengale challenged the Board's authority in federal court. On January 21, 1993, the cause was

---

**6.** Op.Atty.Gen. No. 91–14 (1991).

**7.** Title 59 O.S.1991 § 596 provides:
"It shall be unlawful for any optometrist to render optometric care in any retail, mercantile establishment which sells merchandise to the general public; and it shall be unlawful for any person to display, dispense, sell, provide or otherwise purvey to the public, prescription eyeglasses, prescription lenses, frames or mountings for prescription lenses, within or on the premises of in any manner, any retail or mercantile establishment in which the majority of the establishment's income is not derived from the sale of such prescription optical goods and materials."
The statute remains unaltered since its adoption in 1971.

**8.** Title 59 O.S.1991 § 944 provides in pertinent part:
"... No person, firm, or corporation engaged in the business of retailing merchandise to the general public shall rent space, sublease departments, or other-wise permit any person purporting to do eye examination or visual care to occupy space in such retail store...."
The statute remains unaltered since its adoption in 1953.

**9.** In addition, the letter cited 59 O.S.1991 §§ 593, see note 5, supra, 585, 588, 595, see note 3, supra and OAC 505:10–5–4, see note 4, supra. Title 59 O.S.1991 § 585 provides in pertinent part:
"The Board shall have the power to revoke or suspend any certificate granted by it pursuant to the provisions of this chapter, for fraud, conviction of crime, unprofessional and uneth-ical conduct, habitual drunkenness, exorbitant charges, false representation of goods, gross incompetency, contagious disease, any violation of any rule or regulation promulgated by the Board pursuant to the provisions of this chapter or any violation of this chapter. The following acts shall be deemed by the Board as unprofessional and unethical conduct:
... 3. Acceptance of employment, either directly or indirectly, by a licensed optometrist from an unlicensed optometrist or person engaged in any profession or business or owning or operating any profession or business to assist it, him, or them in practicing optometry in this state ..."
Title 59 O.S.1991 § 588(A) provides in pertinent part:
"... No optometrist shall aid or abet any person not authorized to practice optometry in this state to practice optometry...."

**10.** The four cases were consolidated by agreement of the parties. In the three other causes, the Court of Civil Appeals determined, in unpublished opinions, that no evidence was presented to support a finding that any of the three optometrists had conducted themselves in a manner which adversely affected the quality of visual care provided. Further, it determined that the negotiation of third-party provider agreements were not prohibited referral agreements. Certiorari was denied in each of the causes. *Miller v. Oklahoma Bd. of Examiners in Optometry*, No. 92,921 (Dec.2000), cert. denied, March 27, 2001; *Greenhaw v. Oklahoma Bd. of Examiners in Optometry*, No. 92,853 (Dec.2000), cert. denied, March 27, 2001; *Skaggs v. Oklahoma Bd. of Examiners in Optometry*, No. 93,477 (Dec.2000), cert. denied, March 27, 2001.

dismissed for failure to exhaust administrative remedies.[11] However, LensCrafters was successful in challenging the Attorney General's opinion in state court—in March of 1995, the district court ruled that the opinion did not correctly reflect Oklahoma law and that it should be considered null and void. Although no longer bound by the opinion,[12] the Board did not issue notice of the district court's ruling to Oklahoma optometrists. Rather, on January 13, 1997, a disciplinary hearing commenced against the four optometrists.

¶ 4 Following a hearing and a review of the hearing examiner's recommendations, the Board found that Massengale's agreements with LensCrafters had so integrated his practice with the optical company as to exhibit the appearance of commercialism in a manner which might degrade or reduce the quality of patient care in violation of 59 O.S. 1991 § 593. Further, the Board determined that by allowing LensCrafters to negotiate third-party provider agreements, the optometrist had entered into a referral agreement prohibited by 59 O.S.1991 § 595 and OAC 505:10-5-4. The Board suspended the optometrist's license for one year with a proviso that ten months of the suspension be deferred during a three-year probationary period if Massengale severed all contractual arrangements with LensCrafters. The trial judge, Honorable Daniel L. Owens, affirmed. The Court of Civil Appeals upheld the Board's determination that patients had received substandard care under the doctor's arrangements with LensCrafters. Nevertheless, it reversed on the issues of commercialism and unlawful referral arrangements for lack of sufficient evidence and remanded with instructions. We granted certiorari to petitions filed by Massengale and by the Board on March 27, 2001.

I.

¶ 5 AN OPTOMETRIST'S AGREEMENT TO ALLOW AN OPTICAL SUPPLIER TO NEGOTIATE THIRD PARTY PROVIDER CONTRACTS SUBJECT TO MUTUALLY AGREED UPON TERMS IN WHICH THE OPTOMETRIST APPEARS AS ONE OF AN APPROVED LIST OF SERVICE PROVIDERS AND IN WHICH THERE IS NO INTERFERENCE WITH THE OPTOMETRISTS PROFESSIONAL JUDGMENT DOES NOT CONSTITUTE A PROHIBITED REFERRAL AGREEMENT UNDER 59 O.S.1991 § 595 OR OAC 505:10-5-4.

¶ 6 The Board does not challenge the Court of Civil Appeals determination that there is insufficient evidence in the record to support a finding that Massengale violated the prohibition in 59 O.S.1991 § 593[13] against the appearance of commercialism. Although the Board asserts in the conclusion to its petition for certiorari that there is clear and convincing evidence in the record sufficient to support discipline under the statute and that the language of the statute does not suffer from constitutional infirmity, it does not argue in either its petition for certiorari or in its objection to Massengale's certiorari plea that the doctor should be disciplined for having allowed his practice to have the "appearance of commercialism". Nevertheless, we note that courts have had difficulty in reducing the term "commercialism" to a finite definition or a simple formula. It may be equated with: the solicitation of money or business;[14] location;[15] advertising;[16] or

11. The dismissal was upheld on appeal. *Massengale v. Oklahoma Bd. of Examiners in Optometry*, 30 F.3d 1325, 1329 (10th Cir.1994). The 10th Circuit opinion holds that: 1) administrative procedures guaranteed procedural fairness; 2) seeking disqualification of a board member would not satisfy exhaustion requirements; 3) allegations that a board member operated a traditional practice did not establish an exception to exhaustion requirements; 4) denial of disqualification request did not present extraordinary circumstance entitling optometrist to relief from judgment; and 5) complaint could not be amended after judgment.

12. *Branch Trucking Co. v. State ex rel. Oklahoma Tax Comm'n*, 1990 OK 41, ¶ 12, 801 P.2d 686.

13. Title 59 O.S.1991 § 593, see note 5, supra.

14. *Estate of Taylor*, 5 Ariz.App. 144, 424 P.2d 186, 189, 26 A.L.R.3d 1010 (1967).

15. *Silverman v. Board of Registration of Optometry*, 344 Mass. 129, 181 N.E.2d 540, 543 (1962).

16. *On Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2nd Cir.2001).

connotations of profit.[17]

■ ¶ 7 The sole issue upon which the Board seeks certiorari concerns prohibited referral agreements under 59 O.S.1991 § 595 and OAC 505:10–5–4. It argues that the statute and the rule prohibit all agreements for referrals between an optical supplier and an optometrist—including third-party provider agreements negotiated by an optical supplier on behalf of an optometrist. Massengale contends that there is nothing either in the plain language of the statute or the rule prohibiting LensCrafters from negotiating an agreement resulting in a patient being provided with a list of optometrists approved to provide services under an insurance plan. We agree.

¶ 8 Section 595 prohibits any agreement, contract, arrangement, practice or understanding with an optical supplier which provides for referrals between optometrists and optical suppliers.[18] OAC 505:10–5–4 restricts optometrists from using a commercial business as a "feeder".[19] Neither provision specifically addresses third-party provider agreements nor their negotiation. The Board does not assert that optometrists are prohibited by either the statute or the rule from allowing themselves to be listed as service providers if the third-party provider agreements are negotiated by an entity other than an optical supplier[20] or that all referrals—even those from an optical supplier to an optometrist—are prohibited. Rather, the clear language of § 595 prohibits only "agreement[s], contract[s], arrangement[s],

practice[s], or understanding[s]" that the referrals will be made.

¶ 9 Research reveals no case in which the issue of whether allowing an optical supplier or some other entity to negotiate a third-party provider agreement equates to an agreement for the referral of a particular physician or service provider. However, an examination of the nature of third-party provider agreements renders the Board's assertion that allowing an optical supplier to act as an optometrist's agent in negotiating such contracts equates to an agreement to make referrals unconvincing.

¶ 10 Third-party provider agreements are agreements between an insurer and a provider of goods or services such as a hospital, doctor, optometrist or dentist. The third-party provider is not a party to the insurance contract but agrees to provide, through the third-party provider agreement, a good or service to a policyholder of the insurance company for a set fee with reimbursement to come from the insurer.[21] Some type of a provider agreement is necessary for insurance companies to provide insureds with a service benefit plan. Policyholders are basically unconcerned with the contract between the provider and the insurer except to the extent that these agreements ultimately inure to the policyholders benefit in the form of lower premiums.[22]

¶ 11 A referral is the act of directing attention to something or someone.[23] If a referral exists in the third-party provider context, it is through the listing of the provider on the insurance company's approved list. Here,

---

**17.** See, *Federation Pharmacy Serv., Inc. v. Commissioner of Internal Revenue*, 72 T.C. 687, 1979 WL 3712 (1979), *aff'd*, 625 F.2d 804 (8th Cir. 1980).

**18.** Title 59 O.S.1991 § 595, see note 3, supra. We do agree with the Board's assertion that the clear language of the statute encompasses more than face-to-face solicitations.

**19.** OAC 505:10–5–4, see note 4, supra.

**20.** The Final Agency Order suspending Massengale's license provides in pertinent part at 4:
"... The Board in no way takes the position that third party provider agreements which are

free from influence by optical suppliers are, in any way, improper...."

**21.** See, *Group Life & Health Ins. Co. v. Royal Drug Co.*, note 2, supra; *Dan Purvis Drugs, Inc. v. Aetna Life Ins. Co.*, note 2, supra; E. Gillett, "The Business of Insurance Exemption, Exemption, Who Has the Antitrust Exemption," note 2, supra.

**22.** *Group Life & Health Ins. Co. v. Royal Drug Co.*, note 2, supra.

**23.** *Interest of Andrea P.B.*, 2001 WI App 18, ¶ 8, 240 Wis.2d 516, 625 N.W.2d 307, *review denied*, 2001 WI 43, 242 Wis.2d 547, 629 N.W.2d 785.

although LensCrafters may have negotiated the contract or administered its provisions, the agreement was between the insurance company and Massengale. It is the insurer rather than LensCrafters which ultimately contracted with the optometrist for the listing. The Board does not contend that a referral by the insurance company of the optometrist is prohibited under either 59 O.S. 1991 § 595 or OAC 505:10–5–4.

¶ 12 Massengale did not compromise, through his agreement with the optical supplier, the overriding goal of the Legislature in regulating optometrists—to assure and protect the personal and professional relationship between an optometrist and a patient with the individual's visual care being the prime consideration.[24] Pursuant to the operating agreement between Massengale and LensCrafters, the optometrist agreed to cooperate in third-party programs arranged by the optical supplier provided LensCrafters could negotiate terms upon which the parties mutually agreed.[25]

¶ 13 The record indicates that LensCrafters was successful in negotiating a third-party contract on Massengale's behalf with CIGNA. It appears that, as a result of this contract negotiation, the optometrist was to appear as one of a number of providers under CIGNA's Vision Care Network.[26] Although LensCrafters provided guidance to Massengale on certain codes to be utilized when dealing with the insureds seeking services under plans it negotiated, LensCrafters did not request that the optometrist alter his protocol or administer an examination not complying with the optometrist's general practice.[27] There is no indication that Massengale compromised his professional ethics or that any patient suffered inferior care as a result of his listings as an accepted service provider on the LensCrafters' negotiated agreements.

¶ 14 No convincing reason has been suggested, and we can find none, as to why a third-party provider agreement negotiated by an optical supplier should be singled out from similar agreements negotiated by other parties.[28] Third party provider agreements are not specifically addressed by 59 O.S.1991 § 595 or OAC 505:10–5–4. Further, the term "referral" or "feeder" is not defined in either provision. We determine that an op-

24. Title 59 O.S.1991 § 593, see note 5, supra. See also, *Wyoming State Bd. of Examiners of Optometry v. Pearle Vision Center, Inc.*, note 1 at 978, supra; *Texas State Bd. of Examiners in Optometry v. Carp*, 412 S.W.2d 307–08 (1967).

25. The operating agreement provides in pertinent part:
   ¶ 4 "... Doctor agrees to appoint Lenscrafters as its agent solely for the purpose of establishing third party provider programs in which Doctor agrees to participate pursuant to Section 2(k) of this Agreement...."
   ¶ 2(k) "Doctor agrees to cooperate in such third party or other programs as LensCrafters may arrange on a national, regional, or local basis, provided the parties are able to negotiate terms which are mutually agreed upon."

26. A letter from a LensCrafters' representative to Massengale dated August 31, 1992, provides in pertinent part:
   "... The announcement letter for Cigna Healthpaln is attached. Cigna is sending each vision member a 'Vision Care Network Change' explaining their benefit level and a list of new providers...."

27. Letter from LensCrafters' representative to Massengale dated June 30, 1994, providing in pertinent part:
   "... It has come to my attention that there is some confusion as to which CPT code should be utilized for a general examination when servicing members of the various Managed Care Plans which LVCMS is administering. ... I am aware in your practice you may have exam protocol for CPT codes 92004 and 92014 which surpasses the organizations' protocol. However, for these Managed Care Programs, when you provide a level of service which meets the enclosed protocol, please circle CPT 92004 or 92015.
   We are not requesting changing your protocol. Rather, when servicing members of these organizations, to use the organizations' nomenclature and protocol...."

28. The Court of Civil Appeals relied on *Summers v. State ex rel. Bd. of Examiners in Optometry*, 1971 OK 91, 487 P.2d 706 for the proposition that the only prohibited referrals are door-to-door solicitations. The reliance is misplaced. The Court did not discuss 59 O.S.1991 § 595, see note 3, supra, which was adopted only a few months prior to the *Summers* decision. However, it is instructive that the majority of the optometrist's business in *Summers* came from referrals from an optical supplier and that the *Summers'* Court concluded there was no basis for discipline.

tometrist's agreement to allow an optical supplier to negotiate third-party provider contracts subject to mutually agreed upon terms in which the optometrist is listed as one of a number of approved service providers and in which there is no interference with the optometrist's professional judgment are not prohibited referral agreements under 59 O.S. 1991 § 595 or OAC 505:10–5–4.

## II.

¶ 15 **IN THE ABSENCE OF ANY EVIDENCE OF SUBSTANDARD CLINICAL PRACTICES, UNSATISFIED PATIENTS, OR TESTIMONY INDICATING THAT ANY OF THE OPTOMETRIST'S EMPLOYEES ACTUALLY PARTICIPATED IN AN INCENTIVE PROGRAM SPONSORED BY THE OPTICAL SUPPLIER, THE OPTOMETRIST'S ASSOCIATION WITH THE OPTICAL SUPPLIER HAS NEITHER DEGRADED NOR REDUCED THE QUALITY OF VISUAL CARE IN VIOLATION OF 59 O.S.1991 § 593.**

[8] ¶ 16 Massengale contends that no evidence was presented indicating that his association with the optical supplier in any way degraded or reduced the quality of visual care his patients received in violation of 59 O.S.1991 § 593. The determination that the facts will not support professional discipline makes it unnecessary to address Massengale's assertion that the reference in 59 O.S. 1991 § 593 to the "appearance of commercialism" is so vague and ambiguous as to be unconstitutional. The Board argues that there is clear and convincing evidence to support a finding that the optometrist's relationship with LensCrafters adversely affected patient care. We disagree.

¶ 17 Massengale testified that: although LensCrafters had asked him to lower his exam fees, he refused and ultimately increased charges;[29] despite the request of LensCrafters to automatically add a UV–400 requirement on all his prescriptions, he declined to do so;[30] and although he was aware that LensCrafters would like for him to refer patients to their location next door and that LensCrafters had sent him patients, neither he nor any of his office staff recommended LensCrafters or any other optical supplier. Further, the optometrist insisted that he had taken steps to ensure no referrals occurred.[31]

---

**29.** Transcript of proceedings, January 15, 1997, Massengale testifying and providing in pertinent part at pp. 84–85:
"... Q. You indicated, in response to one of Mr. Markum's questions, that at one time a Lenscrafters fellow came to you and asked you to lower your exam fees; is that correct?
A. That's correct. I do remember....
Q. So did you lower your exam fee?
A. No, I did not. In fact, I probably, not too long after, raised it...."

**30.** Transcript of proceedings, January 15, 1997, Massengale testifying and providing in pertinent part at p. 155:
"... Q. They [Lenscrafters] have also come over there and asked you to start writing UV–400 on all your prescriptions, haven't they?
A. They have.
Q. They wanted you to get a red stamp and stamp it on there, didn't they?
A. That's true. And I did not...."

**31.** Transcript of proceedings, January 15, 1997, Massengale testifying and providing in pertinent part at p. 17:
"... Q. Isn't there a requirement in your lease, Doctor, that a certain number of those patients have to go get their glasses over at Lenscrafters?

A. No.
Q. Well, how do you make sure they go over there?
A. I don't make sure they go over there. In fact, I make sure that no one in our office tells anyone to go to any specific place.
Q. Let's talk about that. Explain what you mean by that.
A. Our policy is, if someone asks us where to go to get their glasses, we tell them there are three places in the mall and one place across the street from the mall that they are welcome to go to and that we don't endorse or shed an ill light on any one of them...."
and at p. 69:
"... Q. How do you know that your staff doesn't direct a patient over to Lenscrafters?
A. Because that's something we constantly talk about. At our office meetings, if we have new staff, that's one of the first things we want to make sure that they know, is that we don't tell patients to go any particular place...."
Transcript of proceedings, January 14, 1997, Massengale testifying and providing in pertinent part at p. 47:
"... Q. Did your employees ever tell your patients about the benefits of going over to Lenscrafters?
A. Absolutely not...."

¶ 18 Massengale recalled one incident in which LensCrafters offered his employees a cash incentive program for the employee who had the most prescriptions filled by the optical supplier. The Court of Civil Appeals relied upon a statement by Massengale that he was unsure what his employees had said to his patients during the time the incentive program was in place as evidence in support of professional discipline.[32] However, a thorough and exhaustive review of the record produced no evidence that any of Massengale's employees actually participated in this program or that any award was ever made.[33] When asked about whether or not he altered prescriptions for LensCrafters' benefit, Massengale explained that optical suppliers may not have the precise prescription power ordered in stock. If not, the optical supplier—whether LensCrafters or another vendor—may contact·him to see if a different power prescription will serve the patient as well as the one recommended. The optometrist emphasized that if the change will not be detrimental to the patient, he allows it. If Massengale does not believe the altered prescription is beneficial to the patient, he refuses the optical supplier's request.[34]

32. The Court of Civil Appeals opinion provides in pertinent part at p. 7:

"... Specifically, in testimony he acknowledged giving at a deposition, Massengale stated that a Lenscrafters [sic] employee offered technicians in his office a cash incentive for the employee writing the most prescriptions that were filled by Lenscrafters [sic]. Massengale stated:
They [his employees] never told me exactly what they said to a patient, and our policy is not to do that. But I do believe that that would be very inviting to them, for a person to go over there and that they dealt with and that their number was on the prescription pad...."

33. Transcript of proceedings, January 15, 1997, Massengale testifying and providing in pertinent part at p. 69:

"... Q. Well, they had this one experience you talked about where somebody from Lenscrafters offered some of your staff a bonus on some basis. Do you recall that?
A. Yes, I do.
Q. What did your staff do about that?
A. I don't know that they did anything. I do know and checked recently, the only staff member that I have that is still working for me that was working for me at that time, and asked her about it. She didn't remember it. And when I prodded her a little bit more about the particulars of that, she still didn't remember and knew that she certainly hadn't received any benefit from it and doubted that anyone else did or she would have known about it...."
and at pp. 115–16:
"... Q. Even the situation, the one instance in eight years, where someone said they were going to set up a deal where someone might be able to get a rebate, it's your understanding that no one ever got paid?
A. That's correct.
Q. And is it also your understanding that no one did the things which Lenscrafters wanted them to do in order to receive that inducement?

A. It's my understanding that it never occurred...."

34. Transcript of proceedings, January 15, 1997, Massengale testifying and providing in pertinent part at p. 64:

"... Q. How about to change a prescription somehow to make it easier for Lenscrafters to deal with?
A. No. On occasion, they may come over and ask me if a different bifocal-ad-power will serve this certain patient just a[sic] well, because they might not have it in stock; and they want to know if it can be anything different than something they do have in stock. I mean, I have no qualms at all about telling them exactly what I think, whether that—if it's okay, I'll tell them I think it's okay. And if it's not, I'll tell them that.
Q. Now, Lenscrafters is probably the only ones that ask you those kinds of questions, because they are right next door.
A. No, I get those questions from every optical place in the mall...."
and at pp. 214–15:
"... Q. There were some questions about—you've talked about how on occasion people from Lenscrafters would ask you to change the prescription about a bifocal. Do you recall that testimony?
A. Yes, I do.
Q. Could you describe for the Court how those situations arise?
A. If I wrote a particular bifocal prescription for a patient, they might go to Lenscrafters or to any other optical retailer. But, in this example, it's Lenscrafters.
And if they did not happen to have that in stock, they might come over and ask me if there was any—you know, one step stronger or one step weaker would work as well for the patient. And I would answer them, like I do on everything else, and what I think is best for the patients. And if I thought it wouldn't make a difference to change the bifocal one step stronger or weaker, I might tell them yes, it was okay, and I would rewrite that....

¶ 19 Massengale has been licensed in Oklahoma since 1989. During the seven days of testimony, no patient was called and no evidence was presented that any patient was unsatisfied with Massengale's services. Nothing in the record indicates any patient was ever confused about whom they were being treated by or why Massengale recommended a particular prescription or course of treatment. Further, the optometrist has never been charged with malpractice and the Board has not notified him of any concern associated with patient care. There was no testimony from Massengale's employees, from the doctor, from a LensCrafter representative or employee, or any other party that referrals had been made by Massengale to LensCrafters or that a referral agreement, express or implied, existed.[35]

■■ ¶ 20 In matters involving the revocation of a professional license, the standard of proof is clear and convincing.[36] Great

35. The Board called Dr. George Redwine (Redwine), an optometrist who had formerly executed agreements with Lenscrafters similar to Massengale's sublease, operating and service mark agreements. Redwine subleased the Crossroads Mall location immediately prior to Massengale taking over. · Transcript of proceedings, February 3, 1997, Redwine testifying and providing in pertinent part at pp. 62–63:

"... Q. Did you ever see anybody at your Crossroads office that you did not know, in there looking at records or talking to the ladies?
A. Yes. One morning, I came to the office and Dr. Massengale, who I didn't know at the time, was standing in my front reception room. And my assistants told me that he had been interviewing them to go to work for them, as well as just observing....
Q. And did Dr. Massengale, in fact, take over the space after your lease, sublease expired at Crossroads Mall?
A. Yes...."

Redwine testified that, in his relationship with Lenscrafters: he was pressured about the hours his practice would be open and about the number of patients he should see per hour; his patient records were reviewed by Lenscrafters' employees; he was urged to hire and fire employees by Lenscrafters representatives; he was advised to prescribe no-line bifocals, plastic lenses, and prescription "add ons" such as tinting and ultraviolet protection; he was asked not to dilate patients' eyes and to alter patient prescriptions; and to refer patients to the optical supplier. Despite Redwine's concerns with Lenscrafters, he actively pursued a renegotiation of his sublease with the optical supplier both at the Crossroads and the Quail Springs locations. Transcript of proceedings, February 3, 1997, Redwine testifying and providing in pertinent part at pp. 80–81:
"... Q. And isn't it true that despite all of these problems that arose when you were working at Quail Springs and all of the concerns you had, you subsequently entered into a sublease for space next to Lenscrafters at Crossroads Mall?
A. Yes.

Q. Is Lenscrafters the only people that have asked you to do that?
A. No, they are not...."

Q. And isn't it true, Doctor, that despite all of these concerns and issues that you were concerned about the fact that their interferences raised questions about your independent practice, you wanted to renew your lease with them at both of your locations?
A. Yes...."
Further, Redwine admitted that he had no knowledge of Massengale's agreements with Lenscrafters and that he believed Massengale to be a good clinical practitioner. Transcript of proceedings, February 3, 1997, Redwine testifying and providing in pertinent part at p. 69:
"... Q. Do you know Dr. Curt Masengale, at least now?
A. Yes.
Q. It's true that you don't know the terms of his agreements with his landlord, isn't it?
A. That's true.
Q. You don't know what his experiences have been with his landlord; isn't that true?
A. That's true.
Q. Do you know if Dr. Massengale is an ethical practitioner?
A. I don't know. I assume he is.
Q. Okay. Do you know if he's a good clinical practitioner?
A. I believe he is...."

36. *Johnson v. Board of Governors of Registered Dentists of the State of Oklahoma*, 1996 OK 41, ¶ 19, 913 P.2d 1339; *State ex rel. State Bd. of Official Shorthand Reporters v. Isbell*, 1990 OK 135, ¶ 3, 803 P.2d 1143. Massengale argues that the Court of Civil Appeals applied something less than the clear and convincing evidence standard mandated by *Johnson v. Board of Governors of Registered Dentists*, 1996 OK 41, ¶ 19, 913 P.2d 1339 in professional licensure causes. The assertion is unconvincing. The Court of Civil Appeals opinion provides in pertinent part:
"... Because this appeal involves the loss of a professional license, the Board was required to prove its case against Massengale by clear and convincing evidence. *See* [sic] *Johnson v. Board of Governors of Registered Dentists*, 1996 OK 41, 913 P.2d 1339. In reviewing the Board's action, we must determine if the record contains substantial evidence from which the Board could have determined there was clear and convincing evidence that Massengale violated the statutes and the rule. *See* [sic]

weight is accorded an administrative entity in the exercise of its expertise.[37] Nevertheless, in determining whether administrative findings and conclusions are supported by substantial evidence, the reviewing court considers all the evidence—including that which fairly detracts from its weight.[38]

¶ 21 Title 59 O.S.1991 § 593 requires that optometrists: practice in an ethical, professional matter; avoid the appearance of commercialism; and refrain from associating with nonprofessionals in any manner which might degrade or reduce patients' visual care. Here, the Court of Civil Appeals determined that there was insufficient evidence to support a finding that Massengale had failed to keep his practice free from any appearance of commercialism—the Board does not challenge the finding on certiorari.[39] The Court of Civil Appeals rested its decision that Massengale was subject to discipline because his agreement with LensCrafters might degrade or reduce the quality of visual care within the meaning of § 593. The determination was based on findings that the optometrist had, at LensCrafters' request, altered prescriptions and allowed his employees to participate in a rewards program sponsored by the optical supplier. Nevertheless, Massengale testified that he changed prescriptions for LensCrafters and other optical suppliers only when his patients would not be adversely affected and no evidence was presented that any of Massengale's employees either participated in the incentive offered by LensCrafters or benefitted from the program. Under these facts—in the absence of any evidence of substandard clinical practices, unsatisfied patients, either an express or an implied agreement relating to referrals or testimony from any patient or employee of the optometrist or the optical supplier that the optometrist referred patients to the optical supplier, we determine that the optometrist's association with the optical supplier has neither degraded nor reduced the quality of visual care in violation of 59 O.S.1991 § 593.

## CONCLUSION

¶ 22 It is for the Legislature, not this Court, to balance the advantages and disadvantages of regulations dealing with visual care.[40] As the Legislature has recognized, optometry is a public health issue.[41] We hold that: 1) the optometrist's agreement to allow LensCrafters to negotiate third-party provider contracts subject to mutually agreed upon terms does not constitute a prohibited referral agreement under 59 O.S. 1991 § 595 or OAC 505:10–5–4; and 2) under the facts presented—in the absence of any evidence of substandard clinical practices, unsatisfied patients, or testimony indicating that any of the optometrist's employees actually participated in an incentive program sponsored by the optical supplier, the optometrist's association with the optical supplier has neither degraded nor reduced the quality of visual care in violation of 59 O.S.1991 § 593.

¶ 23 Our decision today should not be heralded as a departure from the general recognition that regulations relating to visual care are within the state's police power.[42] However, no clear and convincing evidence of unprofessional behavior was presented and no prohibited referrals were made. Therefore, the trial court's order is reversed and the cause is remanded with instructions to

State ex rel. Oklahoma State Bd. of Medical Licensure and Supervision v. Murphy, 1998 OK CIV APP 36, 964 P.2d 227 ...."

**37.** City of Hugo v. Public Employee Relations Bd., 1994 OK 134, ¶ 10, 886 P.2d 485.

**38.** City of Hugo v. Public Employees Relations Bd., see note 39, supra; State ex rel. Cartwright v. Oklahoma Natural Gas Co., 1982 OK 11, ¶ 15, 640 P.2d 1341; El Paso Natural Gas Co. v. Corporation Comm'n, 1981 OK 150, ¶ 9, 640 P.2d 1336.

**39.** See discussion, note 1, supra.

**40.** Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 483–86, 75 S.Ct. 461, 462–63, 75, 99 L.Ed. 563 (1955).

**41.** See, 59 O.S.1991 § 593, note 5, supra.

**42.** Annot., "Validity of Governmental Regulation of Optometry," 22 A.L.R.2d 919, 942 (1952). See also, Annot., "What Constitutes Practice of Optometry," 82 A.L.R.4th 816 (1990).

vacate the Board's order.[43]

**COURT OF CIVIL APPEALS OPINION VACATED; TRIAL COURT REVERSED; CAUSE REMANDED WITH INSTRUCTIONS.**

HARGRAVE, C.J., WATT, V.C.J., HODGES, LAVENDER, OPALA, SUMMERS, BOUDREAU, JJ., concur.

WINCHESTER, J., dissents.