ALAN BRONSTEIN vs. BOARD OF REGISTRATION
IN OPTOMETRY.

Suffolk. November 7, 1988. — December 20, 1988.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Optometry. Landlord and Tenant*, Percentage lease. *Moot Question.*

The Board of Registration in Optometry erred in concluding that an optom-
etrist violated the prohibition of fee sharing set forth in 246 Code Mass.
Regs. § 5.06 (1986), by practicing optometry in offices rented from a
nonoptometrist under percentage lease arrangements, where there was
no evidence to show that the lessor exerted control over the optometrist's
professional activities or shared in income from particular patients be-
cause of referrals. [623-626]

Where issues raised on appeal from a decision of the Board of Registration
in Optometry were moot by reason of the board's determination not to
enforce the relevant portion of its order, this court ordered vacated the
portion of the board's decision and order relating to those issues. [626-
627]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on October 30, 1987.

The case was reported by *Wilkins*, J.

*Joan M. Griffin* (*Walter H. Mayo, III*, with her) for the
plaintiff.

*Thomas A. Barnico*, Assistant Attorney General, for the
defendant.

ABRAMS, J. Alan Bronstein, a registered optometrist,[1] chal-
lenges a decision and order of the Board of Registration in
Optometry (board). The board concluded that Bronstein viol-
ated the prohibition of fee sharing in 246 Code Mass. Regs.

---

[1] An optometrist is a licensed eye doctor who is trained to detect (but not
treat) diseases of the eye and to prescribe corrective lenses. An optician is
a person engaged in the business of providing eyeglasses or contact lenses
to customers. *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U.S. 483, 486
(1955). *Rowe* v. *Standard Drug Co.*, 132 Ohio St. 629, 638 (1937).

§ 5.06 (1986) by practicing optometry in offices rented under percentage lease arrangements, and that he violated G. L. c. 112, § 73B (1986 ed.) by failing to provide entrances into his optometric offices separate from the entrances to premises on which eyeglasses are sold by another. The board ordered Bronstein to remedy the violations within forty-five days of his receipt of the order or face suspension of his license.[2] Bronstein commenced this action in the Supreme Judicial Court for Suffolk County, and a single justice reserved and reported the case to the full court. We conclude that Bronstein's percentage leases do not constitute illegal fee sharing. We therefore reverse that part of the board's decision and order which found a violation of 246 Code Mass. Regs. § 5.06 (1) (1986) and ordered Bronstein to withdraw from his leases. We also vacate as moot those parts of the board's decision and order which concern G. L. c. 112, § 73B (1986 ed.).

Bronstein's professional corporation, Alan Bronstein, O.D., P.C., owns and operates offices for the practice of optometry in Framingham, Braintree, and Saugus. Each of these offices operates under the name "Eyexam." At each location, Bronstein's professional corporation subleases space for the Eyexam offices from Jefrob Management Co.-Mass., Inc. (Jefrob-Mass), a Massachusetts corporation providing consulting services to optometrists. There is a separate lease between Bronstein's professional corporation and Jefrob-Mass at each location.[3]

---

[2] The board also ordered Bronstein to post his name clearly and the names of his optometric associates at the entrance to his offices, as required by G. L. c. 112, § 72 (1986 ed.). Bronstein does not challenge this order. Further, the board ruled that Bronstein violated 246 Code Mass. Regs. § 5.07 (3) (1986), by advertising in affiliation with an optical company, and ordered Bronstein to comply with the terms of that regulation. Because 246 Code Mass. Regs. § 5.07 (3) has been repealed, effective November 11, 1988, 595 Mass. Reg. 90 (Nov. 11, 1988), the parties agree that the issues concerning that regulation need not be decided. The parties also agree that we should vacate the portions of the board's decision and order concerning 246 Code Mass. Regs. § 5.07 (3) and remand it to the board for dismissal.

[3] In addition to the leases, Bronstein has a consulting agreement with Jefrob-Mass whereby Bronstein receives various management and consulting services in return for an annual payment of $80,000, payable in monthly instalments.

Each of these three leases between Bronstein's professional corporation and Jefrob-Mass provides for an annual rental of $75,000 and 15% of the professional corporation's gross revenues in excess of $500,000. The professional corporation is required to make receipts of gross sales available for inspection by Jefrob-Mass.[4] Jefrob-Mass in turn subleases each of the premises from Eyelab, Inc., an optical company. There is a separate lease between Jefrob-Mass and Eyelab at each location. Eyelab leases each of the premises from a separate landlord in each of the three locations.

All three Eyexam offices are located on premises which are adjacent and contiguous to premises occupied by Eyelab's optical stores. A sliding glass door at each location separates Eyexam's office from Eyelab's store, so that customers may walk through Eyelab to reach Eyexam. There is also a rear door at each building leading directly into the Eyexam office.

1. *Fee sharing.* Bronstein argues that his leases do not constitute fee sharing arrangements within the meaning of 246 Code Mass. Regs. § 5.06 (1) (1986 ed.), merely because they call for percentage payments.[5] We agree.

Illegal fee sharing occurs "where a member of a profession divides the compensation he receives from a patient with another member of the same profession or any person who has sent the patient to him or has called him into consultation." *Lieberman* v. *Board of Examiners in Optometry*, 130 Conn. 344, 351 (1943). A regulation against fee sharing prohibits "certain voluntary prospective arrangements for the division

---

[4] Other provisions of the leases include: a requirement that the professional corporation maintain the same business hours as Eyelab; a requirement that the professional corporation not conduct an optometric practice within an eight-mile radius of the leased premises; a requirement that patient records not be removed without providing a copy of the records to Jefrob-Mass; and a requirement that the professional corporation not use the name "Eyelab" in its advertising without Eyelab's consent.

[5] Title 246 Code Mass. Regs. § 5.06 (1) (1986) provides: "An optometrist shall not practice optometry under any lease, contract or other arrangement whereby any person or establishment not duly authorized to practice optometry shares directly in any fees received in connection with said practice of optometry."

of professional income in circumstances where such a practice might threaten or impair the discharge of professional responsibility to clients." *Psychoanalytic Center, Inc.* v. *Burns*, 46 N.Y.2d 1002, 1003 (1979). Even though the amount a person pays under the lease is dependent upon the amount of business he would do, if the lessor exercises no control over the lessee's professional activities, and receives no compensation for referrals, the lease does not constitute a fee sharing agreement. See *Menning* v. *Department of Registration & Educ.*, 14 Ill. 2d 553, 561-562 (1958).

The policy behind the prohibition of fee sharing in the case of optometrists is the same as the policy behind the prohibition of employment of an optometrist by a nonoptometrist. *Kay Jewelry Co.* v. *Board of Registration in Optometry*, 305 Mass. 581, 583 (1940). Both regulations seek to preserve the "immediate and unbroken relationship between a professional man and those who engage his services." *McMurdo* v. *Getter*, 298 Mass. 363, 368 (1937). Fee sharing is seen as an indirect method an unlicensed person may attempt improperly to use to charge and collect fees for the practice of optometry. The ban on fee sharing prevents an optometrist from putting his license at the disposal of an unlicensed person, and from using improper means to solicit patients or patronage. *Board of Examiners in Optometry* v. *Carp*, 412 S.W.2d 307, 311 (Tex.), cert. denied, 389 U.S. 52 (1967).

A percentage lease is an efficient device for figuring the actual value of rented space, and can also serve as a hedge against inflation for the landlord. See *State ex rel. Bd. of Optometry* v. *Sears, Roebuck & Co.*, 102 Ariz. 175, 177 (1967). Note, The Percentage Lease — Its Functions and Drafting Problems, 61 Harv. L. Rev. 317, 318-320 (1948). A percentage lease "gives [the] landlord an opportunity to share in [the] tenant's success without being saddled with long-term low rental agreements. In leases of shopping center stores its use is virtually universal. In other retail establishments its use is

hardly less." 1 M.R. Friedman, Leases § 6.1, at 158-159 (2d ed. 1983).[6]

The board has not cited to us any cases which disapproved of percentage leases by professionals as an illegal fee sharing agreement.[7] Two courts have held that a percentage lease between an optometrist and a nonoptometrist is not an illegal employment agreement. *State ex rel. Bd. of Optometry* v. *Sears, Roebuck & Co.*, 102 Ariz. 175 (1967). *Matter of Kaufman*, 194 N.J. Super. 124 (1984). Ohio has determined that the percentage leases do not constitute fee-sharing agreements. *Rowe* v. *Standard Drug Co.*, 132 Ohio St. 629, 633-634 (1937).[8]

The fact that Bronstein's professional corporation is required to make its records available to Jefrob-Mass does not give rise to the conclusion that Jefrob-Mass exerts control over the optometric practice. The requirement to make records available is

---

[6] This treatise lists the approximate percentage of gross sales charged optometrists under percentage leases as 12%-20%. 1 M.R. Friedman, Leases § 6.3, at 171 (2d ed. 1983 & 1987 Supp.).

[7] One California court ruled that a franchise agreement calling on an optometrist to remit a percentage of his income to the franchisor, an optician, violated a California law forbidding profit sharing and coownership between optometrists and opticians. *California Ass'n of Dispensing Opticians* v. *Pearle Vision Center, Inc.*, 143 Cal. App. 3d 419, 429 (1983). The California statute, however, applying solely to relationships between optometrists and opticians, is broader than the Massachusetts regulation at issue: not only does it forbid profit sharing and coownership between optometrists and opticians, but it bans landlord-tenant relationships between them as well. Cal. Bus. & Prof. Code § 655, as amended (Deering 1988). California has not yet determined the validity of percentage leases between optometrists and nonlicensed persons who are not opticians. One commentator opined that such percentage leases would be found lawful in California unless "all of the facts and circumstances of the lease relationship reveal excessive intrusion by the landlord into the practice of the optometric tenant." Phillips, Room with a View: The Validity of Percentage Leases to California Optometric Tenants, 6 Northrop U.L.J. Aerospace, Bus. & Tax. 31, 40 (1985).

[8] Several States have laws against fee sharing which explicitly provide that percentage leases are not to be considered illegal fee sharing arrangements. See, e.g., *Dixon* v. *Zick*, 179 Colo. 278, 283 (1972); *Board of Examiners in Optometry* v. *Carp*, 412 S.W.2d 307, 310 (Tex. 1967).

necessary for the smooth functioning of the percentage lease. Absent specific proof of improper control or collusion, such a requirement does not constitute a violation of the regulation. See *Rowe* v. *Burt's, Inc.*, 31 N.E.2d 725, 727-728 (Ohio Ct. App. 1939).

Unless, under the guise of a rental percentage lease, a lessor controls the optometry practice or shares in income from particular patients because of referrals or consultation, percentage leases do not constitute fee sharing.[9] See *Dixon* v. *Zick*, 179 Colo. 278, 283 (1972). The board erred in concluding that percentage leases constitute illegal fee sharing.

2. *Mootness.* General Laws c. 112, § 73B, forbids the practice of optometry on premises not separate from premises in which eyeglasses are sold. The board determined that Bronstein violated G. L. c. 112, § 73B, by failing to provide a separate and direct entrance to the public at the Eyexam offices. Even though the Eyexam offices had separate entrances, the board reasoned that they did not comply with the statute because they were not clearly marked or easily accessible. Bronstein challenges this decision of the board on two grounds. First, he argues that his offices complied with the statute's requirement, because all the statute required was separate doors at any location leading into his offices. Second, Bronstein argues that, if the board's construction of the statute was correct, the statute was unconstitutional as abridging the rights of optometrists to affiliate and advertise with opticians as protected by the First Amendment to the United States Constitution.

Since this case was briefed, G. L. c. 112, § 73B, has been amended.[10] The board informed this court in its supplemental

---

[9] The leases in this case provide that Bronstein make percentage payments only from gross receipts above $500,000, and Bronstein has not yet grossed the required minimum amount. These facts support the conclusion that Bronstein's percentage leases are legitimate devices to measure the value of the rented property, and not a sham through which Jefrob-Mass or Eyelab controls Bronstein's practice.

[10] St. 1988, c. 69 (effective Sept. 15, 1988). The earlier version provided that premises adjacent to an optician's store were to be considered separate from the store (and thus, in compliance with the law) only if there was separate and direct entrance into the optometrist's office. As amended,

brief that, because the statute has been amended, it "has determined not to enforce those portions of its decision and order which found violations of and ordered compliance with those laws." Accordingly, the board requests that this court "vacate the relevant portions of the Board's decision and order and decide only the question concerning Bronstein's leases and 246 Code Mass. Regs. § 5.06 [1986]."

Because of the emendation of G. L. c. 112, § 73B, and the board's determination not to enforce its order relating to that provision, the issues raised by Bronstein relating to that law are now moot. "[L]itigation is considered moot when the party who claimed to be aggrieved ceases to have a personal stake in its outcome." *Blake* v. *Massachusetts Parole Bd.*, 369 Mass. 701, 703 (1976). Bronstein has no further personal stake in this matter because the board has stated that it will not enforce its former order.

Bronstein asks us not to vacate the order concerning G. L. c. 112, § 73B. He argues that, if the issue is not determined now, the board may bring another action against him pursuant to G. L. c. 112, § 73B. Speculative fear of future litigation, however, does not save a case from being moot. See *Doe* v. *Bryan*, 102 Nev. 523, 525-526 (1986). Because the change in the statute "significantly alters the posture" of this case, *United States Dep't of Treasury, Bureau of Alcohol, Tobacco & Firearms* v. *Galioto*, 477 U.S. 556, 559 (1986), we think the board is correct in asking us to vacate the order.

Accordingly, we remand the case to the county court for entry of a judgment reversing that portion of the board's decision and order which found a violation of 246 Code Mass. Regs. § 5.06 (1986) and ordered Bronstein to withdraw from his percentage leases with Jefrob-Mass. Further, the county court should remand to the board for dismissal of those portions of the board's decision and order concerning purported violations of G. L. c. 112, § 73B, and 246 Code Mass. Regs. § 5.07 (3) (1986). See note 2, *supra*.

*So ordered.*

---

G. L. c. 112, § 73B, provides that premises are also considered "separate" if the space is "definite and distinct" from the optician's store, and is clearly marked as an optometrist's office.