NOT DESIGNATED FOR PUBLICATION

No. 113,933

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CARL B. DAVIS, Bankruptcy Trustee,
In Re: CHERYL A. HARRELL, UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS, Case No. 13-11176,
*Appellee*,

v.

MARK A. JUDD, O.D., and MARK A. JUDD, O.D., P.A.,
*Appellants.*

MEMORANDUM OPINION

Appeal from Barton District Court; MIKE KEELEY, judge. Opinion filed December 9, 2016. Affirmed in part, reversed in part, and remanded.

*Charles T. Engel* and *Elizabeth A. Baker*, of Engel Law, P.A., of Topeka, for appellants.

*Kenneth H. Jack*, of Davis & Jack, L.L.C., of Wichita, for appellee.

Before BUSER, P.J., HILL, J., and WALKER, S.J.

BUSER, J.: Dr. Mark A. Judd and Cheryl Harrell, in her capacity as administratrix of Dr. Jon R. Harrell's estate, entered into a purchase agreement for the sale of Dr. Jon R. Harrell's optometry practice. The agreement included an additional consideration clause that obligated Dr. Judd to pay Cheryl, individually, a percentage of the practice's yearly gross revenues through 2015, provided those revenues exceeded a certain amount.

Later, Dr. Judd decided these payments of additional consideration were contrary to the Kansas Optometry Law, K.S.A. 65-1501 *et seq.*, and the state's public policy. As a

result, he refused to comply with this provision of the purchase agreement. Cheryl sued Dr. Judd for breach of contract, and the district court entered summary judgment in her favor.

On appeal, Dr. Judd challenges the district court's rejection of his illegality defense, and Carl B. Davis, the trustee of Cheryl's bankruptcy estate and her successor party plaintiff, contends the district court erred when it refused to award prejudgment interest. After carefully reviewing the record and considering the parties' arguments, we affirm the district court's findings regarding the legality of the additional consideration clause, but we reverse the court's denial of Davis' request for prejudgment interest and remand with directions to award Davis prejudgment interest.

FACTUAL AND PROCEDURAL BACKGROUND

Prior to his death on January 1, 2006, Dr. Harrell owned and operated an optometry practice in Great Bend, Kansas, with the assistance of his associate, Dr. Judd. Although Dr. Harrell's wife, Cheryl, provided clerical and accounting services to the practice for many years, state law prohibited her from assuming ownership of or control over the practice because she was not a licensed optometrist. Accordingly, because Dr. Harrell had begun negotiations with Dr. Judd for the purchase of one-half of his practice, Cheryl, in her capacity as administratrix of her husband's estate, offered to sell the entire practice to Dr. Judd.

The parties subsequently entered into a written purchase agreement on February 1, 2006. In the agreement, the parties acknowledged that Dr. Judd had formed Mark A. Judd, O.D., P.A., a professional association, and that he planned to assign "certain interests in the practice of Mark A. Judd, O.D. [to his professional association]." The parties further acknowledged that "Mark A. Judd, O.D., personally and Mark A. Judd,

2

O.D., P.A., shall be jointly and severally liable for fulfillment and satisfaction of all terms, provisions and conditions of th[e] agreement."

According to the purchase agreement, Dr. Judd agreed to purchase the assets of Dr. Harrell's optometry practice, free and clear of any liens, mortgages and encumbrances for $370,000. The parties recognized that the practice was worth more than $370,000, but Dr. Judd planned to pay the purchase price from "the proceeds of a loan secured by [him] from MBNA" Practice Solutions and he was adverse to the idea of acquiring debt in excess of $370,000. Consequently, at Dr. Judd's insistence, the agreement provided that "[a]s additional consideration for th[e] purchase," Dr. Judd would pay Cheryl, individually, "a percentage of gross revenues from the practice" through the year 2015 if said revenues exceeded a certain amount. The purchase agreement also granted Cheryl and her accountant the right to "inspect the records of the practice . . . pertaining to [the] determination of annual gross revenues."

Of particular importance to this appeal, the provision for additional compensation was found in paragraph 17 of the purchase agreement:

> "As additional consideration for this purchase, Buyer agrees to pay to Cheryl A. Harrell, individually, a percentage of gross revenues from the practice if the same exceeds $687,500.00 from February 1, 2006 through December 31, 2006 and, $750,000.00 per calendar year commencing January 1, 2007 and ending December 31, 2015. If the practice during the stated period in 2006 has gross revenues of more than $687,500.00 then 10% of the amount in excess of $687,500.00 shall be paid to Cheryl A. Harrell during the year 2007 in twelve (12) equal monthly payments. For the years 2007 through 2015 10% of the gross revenues in excess of $750,000.00 per year shall be paid to Cheryl A. Harrell in the following year in twelve (12) equal monthly payments with such payment due and payable on or before the 10th day of each month.
> "The parties expressly agree that the term 'gross revenues' as mentioned and used in the immediately preceding paragraph shall include all revenues from the practice of Mark A.

3

Judd, O.D. including revenues from Mark A. Judd, O.D., P.A., associates, partners or others providing services to the practice.

. . . .

"Cheryl A. Harrell and/or her accountant . . . shall be entitled to and upon notice of not less than ten (10) days, to review and inspect the records of the practice of the Buyer pertaining to determination of annual gross revenues."

In addition, paragraph 24 of the purchase agreement, which was "prepared at the mutual request and instruction of both of the parties," provided that the agreement "shall be interpreted in accordance with equity and good conscience and not strictly against any party[, and] [i]f any portion of th[e] [a]greement should be adjudged illegal or unenforceable, the remainder of th[e] [a]greement shall continue to be enforceable."

Upon execution of the purchase agreement, Dr. Judd paid Dr. Harrell's estate $370,000, and Cheryl gave Dr. Judd a bill of sale, indicating that all right and title to the assets of Dr. Harrell's former practice had been transferred to Dr. Judd and his professional association. Then, because the practice generated gross revenues in excess of $687,500 in 2006, Dr. Judd made seven payments of $478.46 to Cheryl in 2007 by drawing her a check from his professional association's account.

After the payments were made, a consultant advised Dr. Judd that it was illegal, at least in most states, to base additional consideration for the purchase of an optometry practice on "the revenue that the practice was generating." As a result, Dr. Judd discontinued the additional consideration payments, and on August 13, 2007, Dr. Judd's attorney informed Cheryl's attorney that Dr. Judd would not be making any further payments as required under paragraph 17 of the purchase agreement. In response, Cheryl filed a lawsuit against Dr. Judd and his professional association. Relevant to this appeal, the lawsuit sought damages for breach of contract and breach of the duty of good faith.

4

After completion of discovery, Dr. Judd moved for summary judgment. The crux of his legal argument was that paragraph 17 of the purchase agreement was illegal and violated long-standing Kansas public policy because it ran afoul of the Kansas Optometry Law. Specifically, Dr. Judd asserted this state law was broken by granting Cheryl, an individual who was not a licensed optometrist, an interest in a portion of his annual gross revenues and a right to examine the books of his practice.

In his motion, Dr. Judd explained that under K.S.A. 65-1505(a) only persons licensed in accordance with the Kansas Optometry Law may practice optometry. Moreover, under K.S.A. 65-1502(a)(1), "a person shall be deemed to be practicing optometry . . . if such person in any manner . . . maintains an office for the practice of optometry," which K.S.A. 65-1502(b)(2) defines as "own[ing] or acquir[ing] any interest in the practice, books, records, files or materials of a licensee." As a consequence, Dr. Judd claimed that Cheryl was maintaining an office for the practice of optometry, and if he complied with what he characterized as paragraph 17's illegal fee splitting requirements, the optometry board could revoke, suspend, or limit his license for unprofessional conduct.

Finally, Dr. Judd asserted that under K.S.A. 65-1513, the practice of optometry by an unlicensed person is a misdemeanor and "Kansas courts have stated that '[w]here a statute expressly provides that a violation thereof shall be a misdemeanor, a contract made in direct violation of the same is illegal, and there can be no recovery thereon.'" Dr. Judd insisted, however, that due to paragraph 24, the "illegality of paragraph 17 in no way diminishe[d] the enforceability of the balance of [the purchase agreement's] terms."

In response to Dr. Judd's motion for summary judgment, Cheryl contended that his allegation of "purported illegality . . . [was] nothing more than a threadbare excuse . . . to avoid paying hundreds of thousands of dollars [he] owe[d] or will owe to [her] under the unambiguous terms of the provision drafted by Dr. Judd's own attorney at Dr. Judd's

5

insistence." According to Cheryl, Dr. Judd's interpretation of the Kansas Optometry Law was "pure nonsense" because he failed to mention that K.S.A. 65-1502(c) provides: "Nothing herein contained shall be construed to prohibit a licensee from entering into leases, agreements, mortgages or other types of debt instruments not in violation of this section or any other section of the optometry law." Cheryl maintained that paragraph 17 fit "squarely within the safe harbor provided by K.S.A. 65-1502(c)," because this paragraph of the purchase agreement was "the equivalent of a private business loan, an ordinary debtor-creditor transaction, for the purchase price in excess of $370,000 that Dr. Judd was loath to borrow."

After a hearing on the motion on November 9, 2009, the district court issued a memorandum decision on December 10, 2009. The district court began its analysis by noting that the Kansas Optometry Law only entitles those with a license to practice optometry. That law also provides that an individual is deemed to be practicing optometry if that person maintains an optometry office. Maintaining an optometry office includes when an individual directly or indirectly controls or attempts to control the professional judgment or the practice of a licensee or the individual bears any of the expenses or owns or acquires any interest in the practice, books, records, files, or materials of a licensee.

Applying this Kansas law, the district court found:

> "Under the[ ] particular facts in this case, [Cheryl was] not attempting to practice in any way, shape or form the actual business of optometry . . . [and] Paragraph 17 does nothing more than include some additional consideration outside of the initial lump sum payment of $370,000 to purchase the assets of [Cheryl's] deceased husband's business."

6

As a result, the district court concluded that "in equity, and pursuant to the terms of the contract itself, as well as the statutes of the State of Kansas," paragraph 17 did not violate the Kansas Optometry Law.

Accordingly, the district court granted Cheryl summary judgment against Dr. Judd and his professional association "under the terms and conditions as set out in the purchase agreement." The district court, however, was unable to award damages on summary judgment because damages "must be determined based on the records and the books" of the optometric practice.

The district court authorized the parties to appeal its findings as to the legality of paragraph 17 immediately because this issue presented "a controlling question of law to which there [was] substantial grounds for difference of opinion." Dr. Judd filed a notice of appeal, and Cheryl filed a notice of cross-appeal. Our court dismissed the appeal and cross-appeal on April 5, 2011, because the judgment was not yet final with regard to the issue of damages.

Upon the return of the case to the district court, on August 9, 2013, Cheryl notified the district court that she had filed a petition for bankruptcy under Chapter 7 of the United States Bankruptcy Code. Shortly thereafter, Carl B. Davis, the trustee of Cheryl's bankruptcy estate, entered an appearance and filed a motion for recognition as a successor party plaintiff and for settlement of the journal entry. With respect to the journal entry, Davis argued that the contractual obligation set forth in paragraph 17 was divisible and he sought entry of a final judgment for the unpaid installments due and owing under paragraph 17 for the calendar years 2007 through 2015. Davis also requested prejudgment interest at the rate of 10% per annum as provided by K.S.A. 16-201.

On February 2, 2015, the district court held a hearing on Davis' motions. Dr. Judd stipulated that the amounts Davis requested for January 10, 2007, and for every month thereafter up through and including December 10, 2014, were correct, and the parties agreed that no monthly payments were due for the 2015 calendar year because Dr. Judd's gross revenues for 2014 did not exceed the amount set forth in paragraph 17. As a result, the only outstanding issue was whether paragraph 17 was a divisible contractual obligation which entitled Davis to collect on the installment payments as they became due and owing.

The district court issued written journal entries on March 2, 2015, and March 19, 2015, wherein the court recognized Davis as the successor party plaintiff and found that paragraph 17 was divisible because "the contract allows for a partial breach[, and e]ach monthly obligation [became] a judgment against the defendants and [was] enforceable by the plaintiffs against the defendants immediately."

Dr. Judd moved to amend the journal entries to reflect the total payment amount and clarify several issues. Similarly, Davis filed a motion for settlement of the journal entry, contending he was entitled to a judgment in the amount of $119,030.67 plus prejudgment interest at the rate of 10% per annum and postjudgment interest thereafter. After a hearing, the district court determined that Davis was entitled to a monetary judgment in the amount of $119,030.67. Although the district court also determined that Davis was entitled to postjudgment interest and the costs of this action, it found that he was not entitled to prejudgment interest.

Dr. Judd subsequently filed a timely notice of appeal, and Davis filed a timely notice of cross-appeal.

## IS PARAGRAPH 17 OF THE PURCHASE AGREEMENT LEGAL UNDER THE KANSAS OPTOMETRY LAW?

Dr. Judd contends the district court erred when it granted summary judgment in favor of Davis because paragraph 17 of the purchase agreement is illegal and contrary to public policy.

*Standards of Review*

Our standard of review for summary judgment proceedings is well settled:

"'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The [district] court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules[; if] reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 622, 345 P.3d 281 (2015).

Moreover, where, as in this case, there is no factual dispute, appellate review of a district court's summary judgment is de novo. See *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013).

In order to resolve this appeal, we must interpret and apply various provisions of the Kansas Optometry Law. This necessitates a brief summary of Kansas law as it relates to the standards courts should use in statutory interpretation. Interpretation of a statute is a question of law over which we exercise unlimited review. *Neighbor v. Westar Energy,*

9

*Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). In conducting this review, the most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. 301 Kan. at 918-19. We must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Cady v. Schroll*, 298 Kan. 731, 738, 317 P.3d 90 (2014). When a statute is plain and unambiguous, however, we do not speculate about the legislative intent behind that clear language, and we refrain from reading something into the statute that is not readily found in its words. 298 Kan. at 738-39. Where there is no ambiguity, we do not need to resort to statutory construction; only if the statute's language or text is unclear or ambiguous do we use canons of construction or legislative history to construe the legislature's intent. 298 Kan. at 739.

*The Legality of Paragraph 17*

In reviewing the legality of paragraph 17 it is necessary to consider some fundamental legal precepts of contract law. First:

> "American courts have traditionally taken the view that competent parties may make contracts on their own terms, provided such contracts are neither illegal nor contrary to public policy, and in the absence of fraud, mistake, or duress a party who has entered into such a contract is bound thereby. [Citation omitted.]" *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 257, 225 P.3d 707 (2010).

Accordingly, "'[i]t is the duty of courts to sustain the legality of contracts in whole or in part when fairly entered into, if reasonably possible to do so[;] . . . the paramount public policy is that freedom to contract is not to be interfered with lightly.' [Citations omitted.]" *Idbeis v. Wichita Surgical Specialists, P.A.*, 279 Kan. 755, 770, 112 P.3d 81 (2005); *Heartland Surgical Specialty Hospital v. Reed*, 48 Kan. App. 2d 237, 244, 287 P.3d 933 (2012).

10

Second, our court exercises unlimited review over the interpretation and legal effect of written instruments, and we are not bound by the lower court's interpretation of those instruments. *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014). Third, because contracts are presumed legal, the burden lies on the party challenging the contract to prove its illegality. *Frazier v. Goudschaal*, 296 Kan. 730, 749, 295 P.3d 542 (2013); *National Bank of Andover*, 290 Kan. at 257.

"An illegal contract is a promise that is prohibited because the performance, formation, or object of the agreement is against the law." *Petty v. City of El Dorado*, 270 Kan. 847, 853, 19 P.3d 167 (2001). Dr. Judd claims that paragraph 17 is illegal because its formation and performance offend the Kansas Optometry Law and "upset[ ] long-held Kansas policies of protecting consumers by prohibiting licensed professionals from sharing professional fees with unlicensed persons."

Davis counters that the purchase agreement should not be voided on grounds of illegality because Dr. Judd relies upon "definitional statute[s] . . . [which] cannot be violated." Moreover, although Davis acknowledges that K.S.A. 65-1513 provides that "[a]ny person who violates *any* of the provisions of th[e] [Kansas Optometry Law] shall be guilty of a class C misdemeanor for the first offense, and for the second and each subsequent offense shall be guilty of a class B misdemeanor," he claims our legislature nullified this statute when it repealed K.S.A. 65-1504(h) and (j), which was entitled "[u]nlawful acts" and expressly stated "it shall be unlawful . . . (h) to practice optometry . . . without having at the time of so doing a valid unrevoked license issued by the optometry board of the state and to have it conspicuously displayed in his or her office" or "(j) to practice optometry in any unethical manner." See L. 1990, ch. 223, sec. 22.

At the outset, Davis' argument is without merit because our legislature did not repeal K.S.A. 65-1513, and courts must presume the legislature does not intend to enact meaningless legislation. See *Fisher v. DeCarvalho*, 298 Kan. 482, 495, 314 P.3d 214

(2013). Moreover, K.S.A. 65-1513 criminalizes a violation of *any* of the provisions of the Kansas Optometry Law, which would logically include the provisions Davis labels as definitional statutes.

In addition, as Dr. Judd points out, even if Davis is correct and K.S.A. 65-1513 no longer has any enforcement power, the legality of paragraph 17 would arguably still control its enforceability because "[a]ny violation of the [O]ptometry [L]aw places an optometrist's license, professional reputation and ability to make a living in jeopardy." In particular, under K.S.A. 2015 Supp. 65-1517(b), "[a] licensee's license may be revoked, suspended or limited, or the licensee may be publicly or privately censured . . . [for] an act of unprofessional conduct or professional incompetence." Under K.S.A. 65-1516(b) "'[u]nprofessional conduct'" includes:

> "(5) Aiding or abetting the practice of optometry by an unlicensed, incompetent or impaired person.
> "(6) Allowing another person or organization to use the licensee's license to practice optometry.
> . . . .
> "(10) Directly or indirectly giving or receiving any fee, commission, rebate or other compensation for professional services not actually and personally rendered, other than through the legal functioning of lawful professional partnerships, corporations or associations.
> . . . .
> "(18) Allowing improper interference with the licensee's professional judgment in providing patient care."

It is undisputed that only persons licensed in accordance with the provisions of the Kansas Optometry Law may practice optometry in the State of Kansas. K.S.A. 2015 Supp. 65-1505(a). Although Dr. Judd concedes that Cheryl was not practicing optometry in the ordinary sense of the term, he contends that Cheryl qualifies as a practitioner of

12

optometry because, by virtue of paragraph 17, she was maintaining an office for the practice of optometry.

K.S.A. 65-1502(a)(1) provides that a "person shall be *deemed* to be practicing optometry within the meaning of the optometry law if such person in any manner . . . *maintains an office for the practice of optometry* as defined in K.S.A. 65-1501 and amendments thereto." (Emphasis added.) According to subsection (b), an individual "'[m]aintains an office for the practice of optometry'" if he or she:

"(1) . . . directly or indirectly control[s] or attempt[s] to control the professional judgment or the practice of a licensee; or

"(2) . . . bear[s] any of the expenses of or [has], own[s] or acquire[s] any interest in the practice, books, records, files or materials of a licensee."

Subsection (c), however, clarifies that K.S.A. 65-1502 shall not be "construed to prohibit a licensee from entering into leases, agreements, mortgages or other types of debt instruments not in violation of this section or any other section of the optometry law." K.S.A. 65-1502(c).

On appeal, Dr. Judd insists that paragraph 17 is illegal because the additional payments of consideration described therein are "a prima facie violation of K.S.A. 65-1502(b)(2)." He contends that Cheryl's acquisition of an interest in the annual gross revenues of his optometry practice along with an associated right to inspect the practice's books qualifies as maintaining an office for the practice of optometry. Although Dr. Judd acknowledges that K.S.A. 65-1502(c) creates a safe harbor for "leases, agreements, mortgages, or other types of debt instruments," he argues that the purchase agreement does not qualify as a debt instrument because the sale was "free and clear of liens, and neither Cheryl nor the Estate retained a lien in any assets of the optometry practice to

13

secure any payments." Dr. Judd further asserts that paragraph 17 does not fall within K.S.A. 65-1502(c) because the additional payments violate the Kansas Optometry Law.

The district court found Dr. Judd's arguments unpersuasive:

"Under the[] particular facts in this case, the plaintiff is not attempting to practice in any way, shape or form the actual business of optometry. Her only relationship to the defendant is a contractual relationship wherein she is attempting to receive consideration that was mutually agreed upon by the parties for the purchase of her deceased husband's optometry practice. The defendants are attempting to come in at a later date and allege because she is receiving payments that are tied to the business revenues of the defendant's business, this is illegal according to their interpretation of the Kansas statutes. Therefore, the plaintiff should be prevented from receiving an agreed upon payment for the decedent's optometry business. In the *St. Francis Reg'l. Med. Ctr., Inc. v. Weiss*[, 254 Kan. 728,] case, the court referred to the case of *Tarry v. Johnston*, 114 Neb[.] 496 (1926). That case is almost identical to the facts and circumstances of this particular case. The court in the *Tarry v. Johnston* case concluded the contract was enforceable in equity and the court considered the purchase price not only to be the initial price but also the percentage of revenue of profits for approximately five years from the date of the sale. This court finds these facts are sufficiently identical to that particular case and the court finds in equity, and pursuant to the terms of the contract itself, as well as the statutes of the State of Kansas, there is not a violation of the optometry laws. Paragraph 17 dealing with the plaintiff receiving compensation through the year 2015 of ten percent of the gross revenues in excess of the amount set forth within that paragraph [is] enforceable.

"The court would note the whole intent of the Purchase Agreement was for the sale and purchase of assets between the two parties. Paragraph 17 does nothing more than include some additional consideration outside of the initial lump sum payment of $370,000 to purchase the assets of the plaintiff's deceased husband's business."

We are persuaded that the plain language of K.S.A. 65-1502 supports the district court's findings because paragraph 17 falls within subsection (c)'s safe harbor for debt instruments, and the additional payments of consideration represented part of the overall

14

purchase price for Dr. Harrell's optometry practice. Moreover, we find no indication that the legislature intended to prohibit optometrists and unlicensed persons from entering into purchase agreements similar to the one at issue here. Indeed, K.A.R. 65-10-2 provides that K.S.A. 65-1502(b) only proscribes contractual arrangements which authorize an unlicensed person to exert *control or influence over a licensee*:

> "Except as authorized by the Kansas professional corporation act or the Kansas limited liability company act or through the lawful functioning of a professional partnership or association with other health care providers, an unlicensed person shall be deemed to be maintaining an office for the practice of optometry if either of the following conditions is met:
> "(a) That person bears any expense for this office by having entered into any rental arrangement, lease arrangement, or debt arrangement with a licensee regarding the licensee's practice *whereby the cost or terms allow the unlicensed person to exert influence on the professional judgment or practice of the licensee*.
> "(b) The licensee's office, location, or place of practice indicates or implies, by location, advertising, or otherwise, that the licensee is practicing as a part of or in association with the business of an unlicensed person." (Emphasis added.) K.A.R. 65-10-2.

Paragraph 17 does not violate K.A.R. 65-10-2 because Cheryl did not bear any expense for Dr. Judd's optometry practice, and by its terms this paragraph does not permit Cheryl to influence Dr. Judd's professional judgment or his optometry practice. Perhaps the best indication that paragraph 17 complies with the regulatory admonition found in K.A.R. 65-10-2 is found in Dr. Judd's deposition testimony wherein he acknowledged that Cheryl *had not exerted any influence* on his professional judgment or the practice itself under the authority of paragraph 17.

Nevertheless, Dr. Judd attempts to analogize this case to *Early Detection Center, Inc. v. Wilson*, 248 Kan. 869, 811 P.2d 860 (1991), wherein our Supreme Court invalidated a covenant not to compete in an employment contract between a general

15

corporation and a physician. Our Supreme Court reached this conclusion because the Kansas Healing Arts Act, K.S.A. 65-2801 *et seq.*, prohibits general corporations from providing medical services or acting through licensed practitioners.

In *Early Detection Center*, Dr. Marvin H. Wilson and Dr. Benson Powell, who were licensed to practice medicine and surgery, formed a professional corporation. Although the articles of incorporation originally restricted the directors and stock ownership to persons licensed to practice medicine or professional nursing in Kansas, the articles were later amended to change the professional corporation to a general corporation, known as Early Detection Center, Inc. (EDC), and to allow individuals not licensed to practice medicine to be directors and own stock.

Shortly after Dr. Wilson was removed as president and CEO of EDC, he left the corporation and formed a competing business. EDC subsequently sued Dr. Wilson, alleging he had breached his covenant not to compete. When the district court granted Dr. Wilson's motion for summary judgment, EDC appealed, alleging that he breached his fiduciary duty to EDC because a general corporation could legally provide medical services by employing licensed physicians.

Our Supreme Court disagreed. The court explained that physicians, surgeons, and doctors of medicine may only form professional corporations to provide medical services if both the person and the professional corporation are properly licensed, and in the event the professional corporation opts to convert to a general corporation, the general corporation may no longer practice any branch of the healing arts. 248 Kan. at 875-76. The Supreme Court compared the prohibitions upon the sharing of fees and the association of licensed and unlicensed persons and entities to "the rules that prohibit a lawyer from sharing legal fees with a non-lawyer or practicing law with any non-lawyer who is a shareholder, director, or officer of the professional corporation. [Citation omitted.]" 248 Kan. at 877.

16

Accordingly, as a general corporation, EDC was prohibited from providing medical services or acting through a licensed practitioner, and our Supreme Court held there could be no legal contract between EDC and Dr. Wilson. 248 Kan. at 880. The Supreme Court explained:

"[I]t is well settled both in law and in equity that the courts will not aid either party to an illegal agreement. The law leaves the parties where it found them. Except in some cases where the parties are not in *pari delicto*, the rule applies even though both parties were party to the illegal contract. While it may not always seem an honorable thing to do, a party to an illegal agreement is permitted to set up the illegality as a defense even though the party may be alleging his or her own turpitude." 248 Kan. at 879.

Our Supreme Court again addressed the corporate practice of medicine doctrine in *St. Francis Regional Med. Center, Inc. v. Weiss*, 254 Kan. 728, 869 P.2d 606 (1994). On this occasion, the Supreme Court was tasked with determining whether employment agreements between hospitals and physicians trigger the doctrine. After considering the matter, our Supreme Court determined that "neither Kansas case law nor statutory law prohibits a licensed hospital[, whether nonprofit or for profit,] from contracting for the services of a physician[, as] [s]uch contracts are not contrary to the interest of public health, safety, and welfare and, therefore, are legally enforceable." 254 Kan. at 746. The Supreme Court wrote:

"As previously noted, in *Early Detection Center, Inc. v. Wilson*, 248 Kan. 869, 811 P.2d 860 (1991), we relied upon the cases of *Winslow*, [115 Kan. 450,] *Goldman*, [142 Kan. 881,] and *Zale*[, 179 Kan. 628]. The basic rationale for those decisions was that to permit a corporation to practice a licensed profession would be injurious to the public welfare. Such a prohibition was necessary to protect the public health. In *Winslow*, we said:

"'Dentistry is a profession having to do with public health, and so is subject to regulation by the state. The purpose of regulation is to protect the public from ignorance, unskillfulness, unscrupulousness, deception, and fraud. To that end the state requires that

17

the relation of the dental practitioner to his patients and patrons must be personal.'
[Citation omitted.]" 254 Kan. at 745-46.

This line of precedent establishes that the corporate practice of medicine doctrine was adopted to protect the relationship between a medical practitioner and the patient from undue influence by an unlicensed entity whose profit margins may not coincide with the patient's best interests. As K.A.R. 65-10-2 makes clear, K.S.A. 65-1502(b) seeks to achieve a similar goal by prohibiting unlicensed persons from indirectly maintaining an office for the practice of optometry by exerting behind the scenes control over or influence upon an optometrist's professional judgment.

Paragraph 17 is not comparable to the corporate practice of medicine cases in Kansas because, unlike the various corporations mentioned above, Cheryl exerted *no control over or influence upon* Dr. Judd or his optometry practice. Dr. Judd, however, insists that Cheryl's contractual entitlement to a portion of his gross revenues still qualifies as an illegal association between a licensed and unlicensed person because the additional consideration payments are the equivalent to a fee-splitting arrangement.

While K.S.A. 65-1502's prohibition against unlicensed persons maintaining an office for the practice of optometry likely prohibits both fee-splitting arrangements and situations involving the corporate practice of medicine because both circumstances would allow an outsider to exert some manner of control over or influence upon an optometrist, the Kansas Optometry Law expressly prohibits fee-splitting. K.S.A. 65-1516(b)(10) provides:  "'Unprofessional conduct' means . . . [d]irectly or indirectly giving or receiving any fee, commission, rebate or other compensation for professional services not actually and personally rendered, other than through the legal functioning of lawful professional partnerships, corporations or associations."

18

We do not view paragraph 17 as providing for an illegal fee-splitting arrangement. Similar to the corporate practice of medicine doctrine, the "purpose of legislation prohibiting the "splitting' or dividing of a fee' . . . is to protect members of the consuming public; it is not to promote the economic welfare of optometrists." *Wyoming State Bd. of Exam. of Optometry v. Pearle Vision Center, Inc.*, 767 P.2d 969, 973 (Wyo. 1989). In fact, according to the Webster's Third New International Dictionary 835 (1993), "fee splitting" is a term used to describe the "dividing of a professional fee for specialist's medical services with the recommending physician." Likewise, Black's Law Dictionary 734 (10th ed. 2014) defines "fee-splitting" as "[t]he division of attorney's fees between two or more lawyers, esp. between the lawyer who handled a matter and the lawyer who referred the matter." In this context, it is unreasonable to presume that the "legislature intended to prohibit *every* business relationship in which an optometrist agreed to pay a percentage of his optometric proceeds for a consideration furnished to him." (Emphasis added.) *Pearle Vision*, 767 P.2d at 973.

As Davis aptly points out, Dr. Judd never explains how paragraph 17 qualifies as a fee-splitting arrangement, nor does he indicate how the additional consideration payments adversely affect the public. This is a significant oversight because the additional consideration payments were not a form of remuneration for patient referrals. Instead, paragraph 17 simply represents the parties' agreed upon method for payment of the purchase price involved in the sale of the practice. Given that this financial arrangement did not impact the number of patients Dr. Judd examined or treated, or the types of optometric services provided, it is implausible that such an arrangement would have any effect on Dr. Judd's ability to provide his patients with the highest degree of optometric care.

While it appears Kansas courts have not addressed the legality of a contract similar to the one at issue in this case, several other states have considered the legality of similar payment arrangements. See, *e.g.*, *Lieberman & Kraff, M.D., S.C. v. Desnick*, 244

Ill. App. 3d 341, 614 N.E.2d 379 (1993); *Bronstein v. Board of Registration in Optometry*, 403 Mass. 621, 531 N.E.2d 593 (1988); *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minnesota*, 671 N.W.2d 213 (Minn. App. 2003); *Tarry v. Johnston*, 114 Neb. 496, 208 N.W. 615 (1926); *Pearle Vision*, 767 P.2d 969.

Dr. Judd takes issue with the use of out-of-state cases because the states have "vastly different statutes and interpretations when it comes to the laws of medicine and optometry," and while this is true, the manner in which other courts have construed similar agreements is still instructive. As the Appellate Division of the Superior Court of New Jersey explained in *In re Adoption of N.J.A.C.* 13:38-1.3(f), 341 N.J. Super. 536, 548, 775 A.2d 629 (2001):

> "The case law from other jurisdictions is, perhaps predictably, not entirely consistent from state to state. But acknowledging that the precise wording of the applicable statutes indeed varies, one conclusion at least can be drawn from the cases from the various jurisdictions . . . in none of the cases has [the existence of a debt instrument] alone been sufficient to make the [holder of said instrument] an unlicensed practitioner of optometry, *absent other indicia of control or influence over the professional practice*." (Emphasis added.)

For example, *Pearle Vision*, 767 P.2d 969, and *Bronstein*, 403 Mass. 621, both exemplify cases which have upheld contractual relationships that *did not* involve control or influence over a professional medical practice. In *Pearle Vision*, the Wyoming Supreme Court concluded that an optometrist who operated an optical products franchise did not have an illegal fee-splitting arrangement with the franchisor even though the franchise fee was premised upon a portion of the optometrist's gross revenues. 767 P.2d at 973-74.

Dr. Robert L. Holly, a licensed optometrist, entered into a contract with Pearle Vision Center, Inc. (Pearle), for the acquisition of a franchise, which required Dr. Holly

20

to enter into a sublease of office space and a separate franchise agreement. Under terms of the sublease, Dr. Holly was obligated to pay Pearle "a base rate and, in addition, a percentage of his total sales in excess of an established amount each month." 767 P.2d at 972. The Wyoming State Board of Examiners of Optometry subsequently brought an action against Dr. Holly and Pearle, alleging, among other complaints, that Pearle was indirectly engaged in the practice of optometry and Dr. Holly and Pearle were involved in an illegal fee-splitting arrangement. 767 P.2d at 970.

Ultimately, the Wyoming Supreme Court affirmed the district court's determination that the arrangement between Pearle and Dr. Holly was legal. 767 P.2d at 970. The court found that although the franchise fee was based in part upon a percentage of Dr. Holly's income, the arrangement did not qualify as "'splitting' or dividing a fee'" because there was no evidence indicating Pearle sent or referred patients to Dr. Holly. 767 P.2d at 973-74. The Wyoming Supreme Court explained:

> "Considered in the context of the agreement, the royalty payment is for the privilege of operating the Pearle Vision Center. The fact that the consideration for that privilege is based in part upon a percentage of the proceeds derived from furnishing optometric services does not make it an agreement for "'splitting" or dividing a fee' any more than would a consideration for the sublease which was based in part upon a percentage of the optometrist's income." 767 P.2d at 974.

With regard to the Board's contention that the franchise agreement improperly authorized Pearle to indirectly engage in the practice of optometry, the Wyoming Supreme Court determined that under the State's statutory scheme, whether an unlicensed party is engaged in such a practice depends upon the relationship between the unlicensed party and the licensed practitioner. 767 P.2d at 976-79. The court then concluded that Pearle was not engaged in the practice of optometry because Pearle did not exercise any control over Dr. Holly:

"Pearle does not exercise control over [Dr.] Holly in his practice of optometry. It does not set the fees [Dr. Holly] charges to his patients; it does not purport to control the manner in which he performs his optometric functions; it does not address his work schedule in the practice of optometry; it does not say anything about the patients whom he may or may not see; it does not send statements to [Dr.] Holly's patients; it does not receive payments made for [Dr.] Holly's optometric service from either the patients or [Dr.] Holly; nor does it purport to direct or control the conduct of [Dr.] Holly's practice of optometry in any other way. We conclude that the significant concern is control over the optometrist in his practice of optometry that might inhibit the freedom necessary for the optometrist to practice in a manner which assures that the interests of the patient are given primary consideration. That is the reason that the legislature may restrict the practice of optometry from corporate influence under its police power. The public is entitled to that protection. [Citations omitted.] We cannot conclude that the legislature intended to restrict the practice of an optometrist, or to prohibit a corporation from contracting with an optometrist, however, unless the arrangement permitted the corporation to exercise control over the optometrist in his optometric practice." 767 P.2d at 978-79.

Similarly, in *Bronstein*, the Supreme Judicial Court of Massachusetts for the County of Suffolk upheld a percentage lease arrangement because the lessor did not exert any influence upon or control over the lessee, a licensed optometrist. 403 Mass. at 621-26. Dr. Alan Bronstein subleased space, through his professional corporation, for his three optometry offices from Jefrob Management Co.-Mass., Inc. (Jefrob-Mass), a Massachusetts corporation that provided optometric consulting services. Each of the leases provided for "an annual rental of $75,000 and 15% of the professional corporation's gross revenues in excess of $500,000." 403 Mass. at 623. For the purpose of determining the practices' gross revenues, Dr. Bronstein was obligated to make the receipts of his gross sales available for inspection by Jefrob-Mass. Upon its review of the arrangement, the Board of Registration in Optometry concluded that the leases violated the State of Massachusetts' prohibition against fee sharing.

22

Similar to *Pearle Vision*, the Supreme Judicial Court for Suffolk County found that the percentage lease did not qualify as illegal fee-sharing because there was no evidence indicating that Jefrob-Mass exercised improper control over or exerted undue influence upon Dr. Bronstein. See *Bronstein*, 403 Mass. at 623-26. "The ban on fee sharing prevents an optometrist from putting his license at the disposal of an unlicensed person, and from using improper means to solicit patients or patronage[, citation omitted,]" and the percentage lease agreement between Jefrob-Mass and Dr. Bronstein simply represented the agreed upon means of payment for Dr. Bronstein's use of the leased space. 403 Mass. at 624-26. Additionally, as the lease agreement purported, the requirement that Dr. Bronstein make his records available to Jefrob-Mass merely ensured that the percentage lease functioned smoothly; the records requirement was not a subterfuge for control or collusion by Jefrob-Mass.

By contrast, *Alpha Real Estate Co.*, 671 N.W.2d 213, exemplifies the court opinions that have invalidated contractual relationships that *do* involve control or influence over a professional medical practice. In *Alpha Real Estate Co.*, the Court of Appeals of Minnesota invalidated an agreement that contained an additional-rent clause premised upon the revenues of a dental practice. Delta Dental Plan of Minnesota, a nonprofit health-service-plan corporation, negotiated a contract with Dr. Ted Erickson. 671 N.W.2d at 215. Under the contract, Delta would purchase and construct a dental clinic and Dr. Erickson would provide medical services under a provider agreement. Delta formed a wholly owned subsidiary by the name of Sui Generis Development Company (Sui Generis) to "act as landlord" and Dr. Erickson formed Alpha Real Estate of Rochester, which leased the property from Sui Generis, and Apollo Dental Center, PLC, which leased the property from Alpha, entered into a provider agreement with Delta, and operated the clinic.

The parties signed an agreement that contained the following provision: "'If in any one calendar year during the first ten years of the Lease (1996-2005) the adjusted cash

23

receipts exceed $1 million, [Alpha] shall pay to Sui Generis additional rent for that particular year a sum equal to five percent of adjusted cash receipts.'" 671 N.W.2d at 215-16. The agreement also provided that in the event Dr. Erickson purchased the clinic, "'the additional five percent rental formula based upon adjusted cash receipts shall continue for the remainder of the ten year period.'" 671 N.W.2d at 216. The parties' lease contained a similar 5% rental surcharge clause, but the lease did not mandate that the surcharge continue in the event the clinic was sold. Importantly, the evidence indicated that while neither Delta nor Sui Generis ever referred any specific patients to the clinic, "the purpose of the five-percent clause was 'as reimbursement for the risk assumed by Delta . . . and also as a partial contribution to defraying Delta's cost of marketing products in the . . . area so as to provide a satisfactory volume of patients' for the clinic." 671 N.W.2d at 219.

The Court of Appeals of Minnesota was tasked with determining whether the 5% clause violated Minnesota's anti-fee-splitting statute. 671 N.W.2d at 218. Ultimately, after noting that fee-splitting compromises patient care because such a situation could impact the medical practitioner's judgment, the appellate court found that while "every form of rent calculation involving a percentage of receipts is [not], as a matter of law, a violation of the anti-fee-splitting law, the agreement in this case crosse[d] the line" because the five-percent clause was premised upon the amount of receipts from patients and Delta's marketing efforts qualified *as an attempt to increase the number of patients* at the clinic. 671 N.W.2d at 221. Unlike *Alpha Real Estate Co.,* in the present case, paragraph 17 did not provide that Cheryl was paid for providing marketing or other services associated with Dr. Judd's practice or that the additional compensation payments were in any way related to actions taken by Cheryl to increase the number of Dr. Judd's patients.

In summary, based upon our Supreme Court's precedent regarding the corporate practice of medicine and caselaw from other jurisdictions pertaining to contractual

24

agreements between licensed medical practitioners and unlicensed individuals/entities, we find that the determination of whether an unlicensed person is illegally maintaining an office for the practice of optometry under K.S.A. 65-1502(b)(2) by virtue of a contractual agreement with a licensee depends upon the nature and circumstances of the relationship. Such agreements transgress the boundaries of K.S.A. 65-1502(c) when, under the totality of the circumstances, the contractual language authorizes the unlicensed person to bear any of the practices' expenses or exercise control over or exert influence upon the professional judgment or practice of the licensee.

When the facts of this case are analyzed under this rubric, it is clear that Cheryl was not illegally maintaining an office for the practice of optometry under terms of paragraph 17 of the purchase agreement. The totality of the circumstances demonstrates that paragraph 17 is what it purports to be, *i.e.*, the parties' agreed upon method to partially pay for the sale of Dr. Harrell's practice. Moreover, the additional consideration payments described within paragraph 17 did not authorize, require, or permit Cheryl to bear any of the practice's expenses or to exercise any control over or exert any influence upon Dr. Judd or his professional judgment. Under these circumstances, the district court did not err when it found as a matter of law that paragraph 17 was legal and enforceable. We affirm the district court's award of summary judgment to Davis.

### DID THE DISTRICT COURT ERR WHEN IT DETERMINED THAT DAVIS WAS NOT ENTITLED TO PREJUDGMENT INTEREST?

As mentioned above, the district court determined that Davis was not entitled to prejudgment interest under K.S.A. 16-201 because the "damages [Davis] was entitled to against the defendants were unliquidated and had not been determined by the [c]ourt[, and] there was no interest rate determined or set out within the contract." But Davis contends the district court abused its discretion by refusing to award prejudgment interest. Inexplicably, Dr. Judd does not address this issue on appeal.

25

K.S.A. 16-201, which governs prejudgment interest, provides:

> "Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and ascertaining the balance; for money received for the use of another and retained without the owner's knowledge of the receipt; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forbearance of payment whereof an express promise to pay interest has been made; and for money due from corporations and individuals to their daily or monthly employees, from and after the end of each month, unless paid within fifteen days thereafter."

Prejudgment interest is generally allowable on liquidated claims, *i.e.*, a claim for which "both the amount due and the date on which such amount is due are fixed and certain or when the same [have] become definitely ascertainable by mathematical calculation. [Citations omitted.]" *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 925-26, 157 P.3d 1109 (2007). In other words, "'[w]here an amount is due upon contract, either express or implied, and there is no uncertainty as to the amount which is due or the date on which it becomes due, the creditor is entitled to recover interest from the due date. [Citations omitted.]'" *Madison v. Shelter Mut. Ins. Co.*, No. 96,417, 2007 WL 2239409, at *7 (Kan. App. 2007) (unpublished opinion) (quoting *Kilner v. State Farm Mut. Auto. Ins. Co.*, 252 Kan. 675, 687, 847 P.2d 1292 [1993]).

The decision whether to award prejudgment interest under K.S.A. 16-201 is a matter of judicial discretion subject to reversal only upon a showing of an abuse of that discretion. See *Owen Lumber Co.*, 283 Kan. at 925; *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 22, 44, 59 P.3d 1003 (2002) (applying abuse of discretion standard in summary judgment proceeding). A judicial action constitutes an abuse of discretion if the action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3)

based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

Despite the district court's finding to the contrary, Davis was entitled to prejudgment interest because the purchase agreement did not specify an interest rate and the additional consideration payments clearly qualify as a liquidated claim. Each payment was definitely ascertainable by mathematical calculation and the date upon which such amount was due was fixed and certain. Although the parties disputed the legality of paragraph 17, the existence of a good-faith controversy regarding whether the defendant is liable for the money does not preclude the district court from awarding prejudgment interest under K.S.A. 16-201. See *Blair Constr., Inc. v. McBeth*, 273 Kan. 679, 689, 44 P.3d 1244 (2002).

Accordingly, we find the district court erred when it declined to award Davis prejudgment interest under K.S.A. 16-201. The district court's order is reversed, and the case is remanded with directions to award prejudgment interest.

Affirmed in part, reversed in part, and remanded with directions.